NELSON v HO

Docket No. 184803. Submitted November 20, 1996, at Lansing. Decided
     February 25, 1997, at 9:40 A.M

Maria E. Nelson brought an action in the Washtenaw Circuit Court
against Laurence Ho, M.D., seeking damages on the basis of a
claimed violation of the Michigan Consumer Protection Act (MCPA),
MCL 445.901 *et seq.*; MSA 19.418(1) *et seq.*, and for intentional
infliction of emotional distress. The plaintiff alleged that the
defendant failed to tell her before operating on her nose that he
would be using nondissolvable sutures and also failed to explain
the risks involved. The plaintiff also alleged intentional infliction of
emotional distress as a result of the defendant's representations to
her after the surgery that he had used dissolvable sutures and that,
therefore, she was incorrect in believing that she had a suture
breaking through the skin of her nose, when in fact she did have a
suture breaking through the skin of the nose. The court, Melinda
Morris, J., granted partial summary disposition for the defendant
and dismissed the MCPA action. The plaintiff appealed from that
order and the Court of Appeals, DOCTOROFF, C.J., and CAVANAGH and
FITZGERALD, JJ., in an unpublished order, entered December 14, 1994
(Docket No. 179429), dismissed the appeal on the basis that the
trial court's order was not final. The trial court then granted sum-
mary disposition for the defendant with regard to the claim of
intentional infliction of emotional distress and dismissed the
action. The plaintiff appealed with regard to both claims.

The Court of Appeals *held*:

1. Only allegations of unfair, unconscionable, or deceptive meth-
ods, acts, or practices in the conduct of the entrepreneurial, com-
mercial, or business aspect of a physician's practice may be
brought under the MCPA. Allegations that concern misconduct in the
actual performance of medical services or the actual practice of
medicine are not proper under the MCPA. Only when physicians are
engaging in the entrepreneurial, commercial, or business aspect of
the practice of medicine are they engaged in "trade or commerce"
within the purview of the MCPA.

2. The plaintiff's allegations concern attacks on the actual per-
formance of the defendant's medical services, which are more

appropriately addressed in the context of a timely filed medical malpractice action. The MCPA does not apply to this case and summary disposition of the claim under the MCPA was proper.

3. The trial court properly held that the claim of intentional infliction of emotional distress was not filed within the applicable three-year period of limitation. The running of the limitation period was triggered sometime between October 1989 and January 1991, the period when the plaintiff sought treatment from the defendant. The March 1994 filing was untimely.

4. The plaintiff's claim was untimely even if the Court of Appeals were to apply the discovery rule to find that the limitation period began to run when the plaintiff discovered, or through the exercise of reasonable diligence should have discovered, that she had a possible cause of action. Under the circumstances of this case, if the plaintiff had been reasonably diligent, she would have actually discovered that the defendant was not being forthright with her at some point before March 29, 1991. The trial court properly dismissed the claim of intentional infliction of emotional distress.

Affirmed.

1. CONSUMER PROTECTION — PHYSICIANS AND SURGEONS — MICHIGAN CONSUMER PROTECTION ACT — WORDS AND PHRASES — TRADE OR COMMERCE.

Allegations that concern a physician's misconduct in the actual performance of medical services or the actual practice of medicine do not come within the purview of the Michigan Consumer Protection Act; allegations of unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of the entrepreneurial, commercial, or business aspect of a physician's practice may be brought under the act; only when physicians are engaged in the entrepreneurial, commercial, or business aspect of the practice of medicine are they engaged in "trade or commerce" within the purview of the act (MCL 445.901 *et seq.*; MSA 19.418[1] *et seq.*).

2. TORTS — LIMITATION OF ACTIONS — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

Claims of intentional infliction of emotional distress must be brought within three years after they accrue; they accrue at the time the wrong upon which the claim is based was done, regardless of the time damage results; the time of the wrong that triggers the running of the limitation period is the date on which the plaintiff was harmed by the defendant's act (MCL 600.5805, 600.5827; MSA 27A.5805, 27A.5827).

*Gary M. Victor*, for the plaintiff.

*Siemion, Huckabay, Bodary, Padilla, Morganti &
Bowerman* (by *Raymond W. Morganti* and *Donna M.
Severyn*), for the defendant.

Before: McDONALD, P.J., and MURPHY and J. D.
PAYANT*, JJ.

MURPHY, J. Plaintiff appeals as of right the trial
court's grant of summary disposition for defendant.
We affirm.

In April 1989, plaintiff visited defendant's office to
seek treatment for a sinus problem. In June 1989,
defendant performed nasal surgery on plaintiff. In the
months following the surgery, plaintiff's nose became
infected, and plaintiff began to feel what she believed
to be a suture breaking through the skin at the tip of
her nose. Plaintiff went to see defendant at least four
times between October 1989 and January 1991 regard-
ing infections and her belief that a suture was break-
ing through the skin of her nose. Plaintiff alleges that
during these visits, although defendant recorded in
his notes that plaintiff did have a suture breaking
through the skin of her nose, defendant consistently
and intentionally told plaintiff that it would be impos-
sible for a suture to be breaking through the skin
because he had used dissolvable sutures.[1] Yet plaintiff
continued to experience problems and hold onto her
belief. In September 1993, plaintiff visited Dr. Frank
Ritter. Ritter informed plaintiff that there was indeed
a suture breaking through the skin of her nose and
referred plaintiff to a plastic surgeon, who removed
stitches from plaintiff's nose in October 1993. Plaintiff

---

* Circuit judge, sitting on the Court of Appeals by assignment.
[1] Plaintiff alleges that defendant intentionally denied the possibility in
an attempt to protect himself from liability.

filed the instant action, alleging that defendant's conduct violated the Michigan Consumer Protection Act (MCPA), MCL 445.901 *et seq.*; MSA 19.418(1) *et seq.*, and amounted to an intentional infliction of emotional distress. Defendant moved for partial summary disposition, arguing that the MCPA does not apply to physicians. The trial court granted defendant's motion, dismissed the MCPA count, and plaintiff appealed. In an unpublished opinion of the Court of Appeals, entered December 14, 1994 (Docket No. 179429), this Court, DOCTOROFF, C.J., and CAVANAGH and FITZGERALD, JJ., dismissed that appeal for lack of jurisdiction because the trial court's order was not final, but merely disposed of one theory of recovery. Subsequently, defendant filed another motion for summary disposition in the trial court, arguing that plaintiff's claim for intentional infliction of emotional distress was barred by the three-year period of limitation set forth in MCL 600.5805(8); MSA 27A.5805(8). The trial court agreed and granted summary disposition. The plaintiff appealed with regard to both claims.

On appeal, we review the trial court's grant of summary disposition de novo. *Turner v Mercy Hosps & Health Services of Detroit*, 210 Mich App 345, 348; 533 NW2d 365 (1995).

I

The first issue in this case is whether a suit brought under the MCPA may be maintained against a physician. This issue is one of first impression in Michigan.

The MCPA prohibits, and defines by general example, "[u]nfair, unconscionable, or deceptive methods, acts or practices in the conduct of trade or commerce." MCL 445.903(1); MSA 19.418(3)(1). The MCPA

contains no language expressly including or excluding physicians from its purview, but broadly defines "trade or commerce" as follows:

> "Trade or commerce" means the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes and includes the advertising, solicitation, offering for sale or rent, sale, lease, or distribution of a service or property, tangible or intangible, real, personal, or mixed, or any other article, or a business opportunity. [MCL 445.902(d); MSA 19.418(2)(d).]

Plaintiff argues that because defendant performed a service primarily for personal purposes, his conduct falls within the definition of "trade or commerce." The trial court ruled, in part, that physicians are not engaged in "trade or commerce" and granted defendant's motion for summary disposition.[2]

The trial court's ruling was based in part on the theory that there is a distinction between the practice of a trade and the practice of a "learned profession." It was stated in dictum in *The Schooner Nymph*, 18 F Cas 506, 507 (CCD Me, 1834) (No 10,338), that wherever any occupation, employment, or business is carried on for the purpose of profit, gain, or a livelihood, not in the liberal arts or in the learned professions, it is constantly called a trade. See anno: *"Learned Profession" exemption in federal*

---

[2] The trial court also ruled that even if defendant was engaged in "trade or commerce," he is exempt from application of the act under MCL 445.904(1)(a); MSA 19.418(4)(1)(a), which states that the MCPA does not apply to "[a] transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." On the basis of our conclusion that defendant's conduct was not "trade or commerce," obviously we need not address whether defendant's conduct properly falls under this exemption.

*antitrust laws (15 USCS §§ 1 et seq.),* 39 ALR Fed
774, 777. It is this definition that led to early United
States Supreme Court cases implying, also by way of
dictum, that the "learned professions" were not
engaged in "trade or commerce" under federal anti-
trust laws. *Id.* See also *Goldfarb v Virginia State Bar,*
421 US 773, 786, n 15; 95 S Ct 2004; 44 L Ed 2d 572
(1975), citing *Federal Baseball Club of Baltimore, Inc
v Nat'l League of Professional Baseball Clubs,* 259 US
200; 42 S Ct 465; 66 L Ed 898 (1922); *Federal Trade
Comm v Raladam Co,* 283 US 643; 51 S Ct 587; 75 L
Ed 1324 (1931); *Atlantic Cleaners & Dyers, Inc v
United States,* 286 US 427; 52 S Ct 607; 76 L Ed 1204
(1932); *United States v Nat'l Ass'n of Real Estate Bds,*
339 US 485; 70 S Ct 711; 94 L Ed 1007 (1950). The dis-
tinction was said to be that, in contrast to practicing
a trade or running a business, "competition is incon-
sistent with the practice of a profession because
enhancing profit is not the goal of professional activi-
ties; the goal is to provide services necessary to the
community." *Goldfarb, supra* at 786.

This theoretical distinction was specifically
addressed in *Goldfarb, supra,* where the United
States Supreme Court considered the issue whether a
minimum-fee schedule for lawyers enforced by the
Virginia State Bar constituted price-fixing in violation
of the Sherman Act, 15 USC 1 *et seq.* The state bar
argued that it was exempt from the Sherman Act
because the practice of law was a "learned profes-
sion," not a "trade or commerce." The *Goldfarb* Court
stated that while "[i]t would be unrealistic to view the
practice of professions as interchangeable with other
business activities, and automatically to apply to the
professions antitrust concepts which originated in

other areas," *id.* at 788, n 17, "[i]t is no disparagement of the practice of law as a profession to acknowledge that it has this business aspect." *Id.* at 788. The Court concluded that "anticompetitive activities by lawyers may exert a restraint on commerce." *Id.*[3]

Today, it is clear that in federal cases a person will not be exempt from the Sherman Act solely on the basis of their status as a learned professional. 39 ALR Fed 779-780; see also *Williams v Kleaveland*, 534 F Supp 912, 916 (WD Mich, 1981) ("there is no blanket exemption to the anti-trust laws for the learned professions"). However, there remains

> judicial recognition of the facts that the learned professions are not as "commercial" as other activities, that not all aspects of professional activity are "trade aspects" subject to the Sherman Act, and that the public interest might not be served by subjecting the learned professions to antitrust standards that have been developed in more commercial contexts. [39 ALR Fed 780, § 2(b)].

This has led to a line of federal cases in which the courts analyze the activities of the professionals in light of a distinction between "commercial" and "non-commercial" conduct. 39 ALR Fed 780; see also *Rousseau v Eshleman*, 128 NH 564, 570; 519 A2d 243 (1986) (Johnson, J., dissenting). According to this line of cases, a commercial motive is required in order to bring the professional activity within the purview of the Sherman Act. *Id.* Such federal decisions interpret-

---

[3] Subsequently, in *Arizona v Maricopa Co Medical Society*, 457 US 332; 102 S Ct 2466; 73 L Ed 2d 48 (1982), the United States Supreme Court, relying in part on *Goldfarb*, struck down as price fixing in violation of the Sherman Act the defendant's maximum-price schedule for fees charged by doctors for services provided.

ing federal antitrust laws have served as the basis for state decisions interpreting state consumer acts.

For example, in *Short v Demopolis*, 103 Wash 2d 52; 691 P2d 163 (1984), the Washington Supreme Court considered the issue whether attorneys could be subject to liability under Washington's Consumer Protection Act (WCPA), Wash Rev Code Ann 19.86.010 *et seq.* Noting that there was a split in state decisions regarding the issue whether those in the learned professions enjoyed immunity from consumer protection acts, *Short, supra* at 59-60, citing *Heslin v Connecticut Law Clinic of Trantolo & Trantolo*, 190 Conn 510; 461 A2d 938 (1983); *Matthews v Berryman*, 196 Mont 49; 637 P2d 822 (1981); *Barnard v Mecom*, 650 SW2d 123 (Tex App, 1983); *Frahm v Urkovich*, 113 Ill App 3d 580; 447 NE2d 1007 (1983), superseded by statute as stated in *Rubin v Marshall Field & Co*, 232 Ill App 3d 522; 597 NE2d 688 (1992); *Lucas v Nesbitt*, 653 SW2d 883 (Tex App, 1983); *Reed v Allison & Perrone*, 376 So 2d 1067 (La App, 1979); *DeBakey v Staggs*, 605 SW2d 631 (Tex App, 1980),[4] the court relied on federal decisions, particularly *Goldfarb, supra,* and held that "certain entrepreneurial aspects of the practice of law may fall within the 'trade or commerce' definition of the [WCPA]." *Short, supra* at 60. *Short* was the basis for the decision in *Quimby v Fine*, 45 Wash App 175; 724 P2d 403 (1986), where the Washington Court of Appeals considered the issue whether actions against a physician may be maintained under the WCPA. The court held that there was "no basis to distinguish the legal practice from the medical practice"

---

[4] See, generally, anno: *Scope and exemptions of state deceptive trade practice and consumer protections acts*, 89 ALR3d 399, § 3, pp 405-407.

and went on to state that claims that relate to "the actual competence of the medical practitioner" and not to the "entrepreneurial aspects of the medical practice" would be improper under the WCPA. *Id.* at 180-181. See also *Jaramillo v Morris*, 50 Wash App 822, 827; 750 P2d 1301 (1988) (holding that because the "entrepreneurial aspects" of a hospital's business were not implicated, the claim was not proper under the WCPA).

In *Frahm v Urkovich, supra,* the Illinois Court of Appeals considered the issue whether that state's consumer fraud act applied to the rendition of legal services. The court relied, in part, on *Goldfarb, supra,* and held that there was no support in the case law or public policy for equating the practice of law with an ordinary commercial enterprise. *Frahm, supra* at 584. *Frahm* was the basis for the decision in *Feldstein v Guinan*, 148 Ill App 3d 610, 615; 499 NE2d 535 (1986), where the court held that because the "practice of medicine is not the equivalent of an ordinary commercial enterprise," a proper claim under the Illinois consumer fraud act must implicate the business aspect of the practice of medicine. See also *Gadson v Newman*, 807 F Supp 1412, 1416 (CD Ill, 1992) ("The distinction between the business aspects of medicine and the 'actual practice of medicine' or the non-business aspects [of] medicine is crucial.").

We consider these decisions instructive and persuasive. We agree that "[i]t would be a dangerous form of elitism, indeed, to dole out exemptions to our [consumer protection] laws merely on the basis of the educational level needed to practice a given profession, or for that matter, the impact which the profession has on society's health and welfare." *Short,*

*supra* at 58, citing *United States v Nat'l Society of Professional Engineers*, 389 F Supp 1193, 1198 (D DC, 1974), vacated and remanded 422 US 1031 (1975) (for reconsideration in light of *Goldfarb, supra*). Also, because the MCPA broadly defines "trade or commerce," in part, as the "conduct of a business," and the practice of medicine clearly has a business aspect, a blanket exemption for the learned professions would be improper. However, we are also of the opinion that it would be improper to view the practice of medicine as interchangeable with other commercial endeavors and apply to it concepts that originated in other areas. *Goldfarb, supra*. Therefore, a blanket inclusion in the MCPA for physicians would also be improper. Consequently, we align ourselves with the line of cases set forth in this opinion and hold that only allegations of unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of the entrepreneurial, commercial, or business aspect of a physician's practice may be brought under the MCPA. Allegations that concern misconduct in the actual performance of medical services or the actual practice of medicine would be improper. We do not consider the Legislature's use of "trade or commerce" in defining the application of the act to exhibit an intent to include the actual performance of medical services or the actual practice of medicine. If we were to interpret the act as such, the legislative enactments and well-developed body of law concerning medical malpractice could become obsolete. While we are aware of the expense and difficulty in maintaining a medical malpractice action, we do not think the MCPA was meant by the Legislature to be an alternative to its specific statutory scheme addressing

medical malpractice claims. Only when physicians are engaging in the entrepreneurial, commercial, or business aspect of the practice of medicine are they engaged in "trade or commerce" within the purview of the MCPA.

In determining whether an action is proper under the MCPA, courts must examine the nature of the conduct complained of case by case and determine whether it relates to the entrepreneurial, commercial, or business aspect of the practice of medicine.[5] In this case, plaintiff alleges that defendant failed to tell her before operating on her that he would be using nondissolvable sutures in her nose and also failed to explain the risks involved. Plaintiff also alleges that defendant represented to her that she did not have a suture breaking through the skin at the tip of her nose when in fact she did. We do not consider either one of these allegations to charge defendant with misconduct in the entrepreneurial, commercial, or business aspect of his practice. Rather, we consider these to be principally attacks on the actual performance of defendant's medical services, which would be more appropriately addressed in the context of a timely filed medical malpractice claim. Therefore, the MCPA does not apply, and plaintiff has failed to state a claim upon which relief can be granted. Summary disposition with regard to the claim under the MCPA was proper. MCR 2.116(C)(8).

---

[5] Recently, this Court decided the case of *Baker v Arbor Drugs, Inc*, 215 Mich App 198; 544 NW2d 727 (1996), in which an issue concerned whether a suit under the MCPA was proper against a pharmacy. This Court held in the affirmative. We consider *Baker* to be in harmony with our decision in the case at bar because the conduct at issue in *Baker* was the defendant's advertising. *Id.* at 206-208. Advertising is clearly entrepreneurial, commercial, or business conduct.

II

Next, plaintiff claims that the trial court erred in ruling that her claim of intentional infliction of emotional distress was barred by the statute of limitations.[6] We disagree.

As a general rule, untimely filed tort claims are barred by the statute of limitations. *Lemmerman v Fealk*, 449 Mich 56, 63; 534 NW2d 695 (1995). Claims of intentional infliction of emotional distress must be brought within three years after they accrue in order to avoid the limitation bar. *Id.* at 63-64; MCL 600.5805; MSA 27A.5805. A claim accrues at the time the wrong upon which the claim is based was done, regardless of the time damage results. MCL 600.5827; MSA 27A.5827. The time of the wrong that triggers the running of the limitation period is the date on which the plaintiff was harmed by the defendant's act. *Stephens v Dixon*, 449 Mich 531, 534-535; 536 NW2d 755 (1995).

In this case, plaintiff claims that she suffered emotional distress as a result of defendant's intentionally misrepresenting that plaintiff did not have a suture breaking through the skin of her nose, when plaintiff believed she did, and when in fact she did. Therefore, plaintiff was harmed by defendant's actions at some time between October 1989 and January 1991, the period in which plaintiff sought treatment from defendant. As a result, the running of the limitation period was triggered, at the latest, in January 1991,

---

[6] We feel it necessary to note that the tort of intentional infliction of emotional distress has yet to be formally recognized by the Michigan Supreme Court. See *Roberts v Auto-Owners Ins Co*, 422 Mich 594; 374 NW2d 905 (1985). However, this Court has recently recognized the cause of action. *Haverbush v Powelson*, 217 Mich App 228; 551 NW2d 206 (1996).

which would make plaintiff's March 1994 filing untimely. However, plaintiff argues that she should be entitled to the benefit of the discovery rule and that, under that rule, her claim did not begin to accrue until October 1993, when she was informed by Dr. Ritter that she had been lied to by defendant.

While there is no authority in Michigan for applying the discovery rule to a claim of intentional infliction of emotional distress, in general, application of the discovery rule may be appropriate when a plaintiff would otherwise be denied a reasonable opportunity to bring suit, because of the latent nature of the injury or the inability to discover the causal connection between the injury and the defendant's wrongful conduct. *Lemmerman, supra* at 65-66. The discovery rule is generally applied where there is some verifiable basis for the plaintiff's inability to bring the claim "within the statutorily proscribed limitation period." *Id.* at 66-67. Under the discovery rule standard, a plaintiff's cause of action accrues when he discovers, or through the exercise of reasonable diligence, should have discovered, that he has a possible cause of action. *Moll v Abbott Laboratories*, 444 Mich 1, 20-25; 506 NW2d 816 (1993). Once a claimant is aware of an injury and its possible cause, the claimant is aware of a possible cause of action. *Id.* at 24.

While we offer no opinion, from a general standpoint, with regard to whether the discovery rule should be applied to claims of intentional infliction of emotional distress, we hold that even if we were to apply the discovery rule standard to the facts of this case, plaintiff's claim would still be filed untimely. As previously indicated, plaintiff began suffering emotional distress, and was aware of her injury, at some

point between October 1989 and January 1991, when she began to question her sanity in light of defendant's denials that a suture was breaking, or could break, through the skin of her nose. However, plaintiff argues that because she did not conclude that her emotional distress was caused by defendant's intentional misrepresentations until she visited Dr. Ritter, her claim should not begin to accrue until September 1993. We disagree. Plaintiff may not have actually discovered that her emotional distress was caused by defendant's allegedly intentional misrepresentations until she visited Dr. Ritter, but that is not the standard. Once a plaintiff is aware of an injury and it's *possible* cause, the limitation period begins to run. *Moll, supra* at 24. In this case, plaintiff originally believed she had a stitch breaking through the skin of her nose in October 1989 and sought treatment from defendant regarding her belief until January 1991. Throughout this time, plaintiff continued to harbor her belief, even in the face of defendant's denials, and continued to experience other problems with her nose, such as infection. We find it unreasonable to believe that if after a year and a half (October 1989 to March 29, 1991—three years before the filing of this action) plaintiff believed so strongly that she had a suture breaking through the skin of her nose, to the point where defendant's continued denials caused her severe emotional distress to the point where she questioned her own sanity, it should not have occurred to her, at some point during this time that *possibly* she was correct and her distress was caused by the fact that defendant may not have been forth-

right with her.[7] Also, we believe that, under these circumstances, if plaintiff had been reasonably diligent, she would have actually discovered, at some point before March 29, 1991, that defendant was not being forthright with her. Therefore, if plaintiff was not actually aware of the possible cause of her distress at some point before March 29, 1991, she should have been, and with reasonable diligence would have been, in all probability, not only aware of a possible cause of her distress, but the actual cause.[8] The trial court properly dismissed plaintiff's claim of intentional infliction of emotional distress. MCR 2.116(C)(7).

Affirmed.

___

[7] Plaintiff argues that such a holding "would punish the patient who relies upon his doctor's advice and places a premium on skepticism and distrust." *Johnson v Caldwell*, 371 Mich 368, 379; 123 NW2d 785 (1963). However, under the facts of this case, especially, the alleged strength of plaintiff's belief and the presence of infection, which would also seem to indicate that perhaps defendant was not being forthright, we believe that a reasonable person would have been skeptical, at least to the point of questioning the *possibility* that the physician was not being forthright. Obviously in this case plaintiff continued to harbor some belief that she was correct because she questioned defendant about her condition on several occasions between October 1989 and January 1991. While we agree that after defendant's continued denials it would be reasonable, and understandable, for plaintiff to question herself, if plaintiff's belief was as strong as she alleges, it would also be reasonable, at some point, for plaintiff to question defendant's veracity, if not his competence.

[8] If a question of fact exists regarding when a plaintiff discovered or should have discovered a cause of action, then summary disposition is improper. However, under the facts of this case, we conclude that no genuine issue of fact exists whether plaintiff discovered or should have discovered her possible claim before March 29, 1991. See *Mascarenas v Union Carbide Corp*, 196 Mich App 240, 245; 492 NW2d 512 (1992).