HECKMANN v DETROIT CHIEF OF POLICE

Docket No. 260115. Submitted June 14, 2005, at Detroit. Decided July 26, 2005, at 9:05 a.m.

Eric C. Heckmann brought an action in the Wayne Circuit Court against the Detroit Chief of Police and others, alleging a violation of the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.*, and intentional infliction of emotional distress relating to his treatment as an employee of the police department after he sent a letter to the police chief and the mayor of Detroit detailing allegations of financial mismanagement in the police department. The court, John H. Gillis, Jr., J., granted summary disposition for the defendants, ruling that the WPA claim is precluded because the plaintiff failed to exhaust administrative remedies available through grievance procedures provided under a collective bargaining agreement, and that the plaintiff failed to establish the existence of a genuine issue of material fact concerning outrageous and extreme conduct to avoid summary dismissal of the claim of intentional infliction of emotional distress. The plaintiff appealed.

The Court of Appeals *held*:

1. The circuit court erred by ruling that the plaintiff must have exhausted his administrative remedies, that is, by the filing of a union grievance, before he could invoke his rights under the WPA. The plaintiff's administrative remedies are separate and distinct from his rights and remedies under the WPA. To apply the doctrine of exhaustion of remedies to the WPA claim would frustrate the purpose of the act, particularly when the act provides that relief must be sought within ninety days after the occurrence of the alleged violation of the act. That span obviates the possibility of the exhaustion of administrative remedies.

2. The circuit court erred as a matter of law by ruling that the plaintiff must show that he was fired, demoted, or transferred in order to state a viable WPA claim. The allegation that a supervisor told the plaintiff to start looking for a job elsewhere if he kept "making waves" and wasting the supervisor's time, and evidence supporting that allegation, support the inference that the supervisor-defendant threatened the plaintiff with discharge in

retaliation for his letter. MCL 15.362 provides that an employer shall not threaten or otherwise discriminate against an employee for protected activities. Material questions of fact exist regarding whether the comment was made by the supervisor, whether it was a threat of discharge, and whether it was causally related to the plaintiff's letter. Summary disposition was inappropriate.

3. Ostracism or social isolation is not the sort of conduct that rises to the level of an adverse employment action barred by the WPA. In this case, the plaintiff communicated regularly with his supervisor and maintained working relationships with his supervisor and coworkers. These negate the allegation related to ostracism and social isolation.

4. To the extent that the WPA requires that a whistleblower report to a public body other than the whistleblower's employer, the plaintiff satisfied the requirement by sending a copy of his letter to the mayor.

5. The circuit court properly dismissed the claim for the intentional infliction of emotional distress. Reasonable minds could not differ and would conclude that the defendants' alleged conduct that formed the basis of the plaintiff's claim was not outrageous.

Affirmed in part, reversed in part, order of summary disposition for the defendants vacated, and case remanded for further proceedings.

1. MASTER AND SERVANT — WHISTLEBLOWERS' PROTECTION ACT — EXHAUSTION OF ADMINISTRATIVE REMEDIES.

The Whistleblowers' Protection Act does not require that administrative remedies be exhausted before relief is sought under the act (MCL 15.361 *et seq.*).

2. MASTER AND SERVANT — WHISTLEBLOWERS' PROTECTION ACT — PROTECTED ACTIVITIES — ADVERSE EMPLOYMENT ACTIONS.

A threat of discharge from employment following an employee's report of a violation or suspected violation of law may support a claim by the employee that the employer threatened the employee in violation of the Whistleblowers' Protection Act (MCL 15.362).

3. MASTER AND SERVANT — WHISTLEBLOWERS' PROTECTION ACT — PROTECTED ACTIVITIES — OSTRACISM — SOCIAL ISOLATION.

Ostracism and social isolation are not the sorts of conduct that rise to the level of an adverse employment action barred by the Whistleblowers' Protection Act (MCL 15.362).

4. MASTER AND SERVANT — WHISTLEBLOWERS' PROTECTION ACT — PUBLIC BODY.

The Whistleblowers' Protection Act requires that a whistleblower report to a public body; where an employee of a city's police department sends a report to the city's mayor, the requirement of reporting to a public body is satisfied (MCL 15.361 *et seq.*).

*Stefani & Stefani, P.C.* (by *Michael L. Stefani* and *Frankie J. Rivers*), for the plaintiff.

*Andrew R. Jarvis*, Senior Assistant Corporation Counsel, for the defendants.

Before: SAWYER, P.J., and MARKEY and MURRAY, JJ.

PER CURIAM. Plaintiff Eric Heckmann is a civilian employee of the fiscal operations section (FOS) of the Detroit Police Department. On September 11, 2002, plaintiff wrote a five-page letter to the then newly appointed chief of police detailing allegations of gross mismanagement and fraud within the department, including the hiring of unnecessary employees who performed no meaningful work, misuse of overtime, falsification of time records, misuse of government property, and premature payments of invoices. Plaintiff claims that as a result of this letter, defendants threatened or otherwise discriminated against him in violation of the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.* Plaintiff sued and also alleged in a second count that defendants intentionally inflicted emotional distress. The trial court granted defendants' motion for summary disposition, and plaintiff appeals by right. Because we find that plaintiff pleaded and factually supported some of his WPA claims, we reverse in part, affirm in part, and remand for further proceedings in the trial court.

## I. SUMMARY OF FACTS AND PROCEEDINGS

Plaintiff is a longtime city of Detroit employee who

has worked for the city's police department since 1992. In 2002, plaintiff was a principal accountant in the department's FOS. Plaintiff claims that in August 2002, he sent a memorandum to Deputy Chief Brenda Goss Andrews, supervisor of the department's management services bureau, requesting a meeting to discuss his observations of financial misconduct within the FOS. Upon receiving no response from Andrews, plaintiff sent his September 2002 letter to newly appointed chief of police, Jerry Oliver. Plaintiff also forwarded a copy of the letter to Detroit Mayor Kwame Kilpatrick and to the president of the Association of Professional and Technical Employees, a union in which plaintiff was a member. Plaintiff acknowledged that beginning in January 2003 the union had initiated approximately five grievance procedures on his behalf.

Plaintiff asserts that he did not receive a response to his September 2002 letter until being called to a meeting in Andrews's office on April 8, 2003. Defendants Marlene Hobbs and Hasumati Patel, the manager of the FOS also attended. After Patel's appointment in January 2003, plaintiff initiated the first of his grievances, which alleged that Patel had been appointed to her position contrary to the union contract and the city's own rules regarding promotional opportunities. Plaintiff also had criticized Hobbs in his September 2002 letter, but Hobbs was promoted in April 2003 to the position of head governmental analyst in charge of the accounts payable unit of the FOS. Plaintiff claims that, during the April meeting, Andrews discussed his September 2002 letter and that Andrews told plaintiff that he should "start looking for a job elsewhere" if he kept "making waves" and forcing Andrews to waste her time.

Plaintiff asserts that Andrews's comment to him at the April meeting was a "threat" within the meaning of MCL 15.362. Plaintiff further alleges that after the April meeting, defendants "otherwise discriminated" against him by reducing his duties and socially isolating him. With respect to the former claim, plaintiff testified that Patel authored a memorandum on April 10, 2003, outlining the respective work assignments of various FOS personnel. According to plaintiff, although others were assigned ten or more duties, he was assigned only four. Plaintiff acknowledged, however, that his four assigned responsibilities entailed accounting for approximately $65 million to $80 million. Regarding social isolation, plaintiff testified that his supervisors would ignore him but make a point of saying hello to every other person in the office. But plaintiff acknowledged that he had a working relationship with Patel, with whom he communicated regularly by e-mail. Plaintiff also admitted that no acrimony existed between him and his co-workers, with whom he also maintained a working relationship.

In moving for summary disposition, defendants argued that plaintiff's September 2002 letter was not a "report" within the meaning of the WPA because it was not made to an outside agency; rather, it was merely an intra-agency complaint sent up the normal chain of command. Defendants also argued that plaintiff had not suffered an adverse employment action because he had not been fired, demoted, or transferred to a different job; plaintiff retained the same job classification he had held, albeit with some altered job assignments. Defendants further noted that although plaintiff was a union member, he had not initiated a grievance regarding his WPA claims.

In opposing defendants' motion for summary disposition, plaintiff alleged that he was passed over for promotion in January 2003 when the position of supervisor was filled without being posted or through other normal procedures.[1] Plaintiff also pointed to his claim that in April 2003 Andrews told him to start looking for another job if he continued to "make waves." Plaintiff also argued that his duties had been significantly reduced and that being ignored had created hostility.

In granting defendants summary disposition, the trial court stated:

> Okay, in this case the Plaintiff is a member of a union and subject to a collective bargaining agreement and has not exhausted his administrative remedies. Secondly, he was not fired. He was not demoted. He was not transferred. Because he didn't get a promotion is not the basis for [a] cause of action. The motion is granted on all counts.

On appeal, plaintiff challenges the trial court's ruling that dismissal of the WPA claim was proper because plaintiff had not suffered an adverse employment action for the purposes of the act and had failed to exhaust union remedies, and that, in fact, he should have received summary disposition on that claim because he established without rebuttal a prima facie case. Plaintiff further asserts that he established the existence of a genuine issue of material fact concerning whether he had suffered outrageous and extreme conduct for the

---

[1] Plaintiff does not allege a failure to promote as a WPA violation in his complaint. Indeed, because plaintiff filed his complaint on July 1, 2003, the ninety-day WPA period of limitations had expired with respect to the January 2003 appointment of Patel as supervisor of the FOS. MCL 15.363(1). See also *Garg v Macomb Co Community Mental Health Services*, 472 Mich 263, 290; 696 NW2d 646 (2005), declaring, with respect to the general three-year period of limitations of MCL 600.5805 and a Civil Rights Act retaliation claim, MCL 37.2701, that "the 'continuing violations' doctrine . . . has no continued place in the jurisprudence of this state."

purposes of his emotional distress claim. Plaintiff additionally argues that defendants were not entitled to summary disposition because they failed to comply with the rules of discovery.

## II. STANDARD OF REVIEW

We review de novo a trial court's decision on a motion for summary disposition. *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). A motion for summary disposition brought under MCR 2.116(C)(10) tests the factual sufficiency of a complaint and must be supported by affidavits, depositions, admissions, or other documentary evidence. MCR 2.116(G)(3)(b); *Corley v Detroit Bd of Ed*, 470 Mich 274, 278; 681 NW2d 342 (2004). The trial court and this Court must view the substantively admissible evidence submitted at the time of the motion in the light most favorable to the party opposing the motion. *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999). "Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West, supra* at 183.

We also review de novo questions of law, including statutory construction. *Anzaldua v Band*, 457 Mich 530; 578 NW2d 306 (1998).

### III. WPA ANALYSIS

#### A. EXHAUSTION OF ADMINISTRATIVE REMEDIES

We first hold that the trial court erred as a matter of law by applying the doctrine of exhaustion of adminis-

trative remedies to plaintiff's statutory WPA claim. Plaintiff's administrative remedies are separate and distinct from his rights and remedies under the WPA. To apply the doctrine of exhaustion of administrative remedies would frustrate the purpose of the statute, particularly when the statute provides that relief must be sought "within 90 days after the occurrence of the alleged violation of [the] act" or be lost. MCL 15.363(1).

We are guided by the following principles of statutory construction set forth by our Supreme Court in *Shallal v Catholic Social Services of Wayne Co*, 455 Mich 604, 611; 566 NW2d 571 (1997):

> The cardinal rule of all statutory construction is to identify and give effect to the intent of the Legislature. The first step in discerning intent is to examine the language of the statute in question. We read the language according to its ordinary and generally accepted meaning. Judicial construction is authorized only where it lends itself to more than one interpretation. We also consider that remedial statutes, such as the Whistleblowers' Protection Act, are to be liberally construed, favoring the persons the Legislature intended to benefit. [Citations omitted.]

Nowhere in the statute has the Legislature either expressly or impliedly limited its protection to whistle-blowers who have exhausted other possible remedies, whether those possible remedies are statutory, contractual, or administrative. Indeed, when the WPA duplicates possible common-law remedies, the statute provides the exclusive remedy. *Dudewicz v Norris Schmid, Inc*, 443 Mich 68, 78-79; 503 NW2d 645 (1993). The purpose of the statute is "to alleviate . . . the inability to combat corruption or criminally irresponsible behavior in the conduct of government or large businesses," *id.* at 75, by removing the barrier of fear of retribution that prevents employees in the best position to report corruption from reporting it, *Shallal, supra* at 612. We

thus further the purpose of the WPA of protecting whistleblowers by not reading into the statute limitations the Legislature did not express.[2]

Our reading of the statute is also consistent with prior case law applying the WPA and comparable employment discrimination statutes. See, e.g., *Shallal, supra* at 617, quoting *Rouse v Farmers State Bank of Jewell, Iowa,* 866 F Supp 1191, 1204 (ND Iowa, 1994) (" '[W]histleblower statute[s] [are] analogous to antiretaliation provisions of other employment discrimination statutes and . . . the policies underlying these similar statutes warrant parallel treatment . . . .' "). See also *Roulston v Tendercare (Michigan), Inc,* 239 Mich App 270, 280; 608 NW2d 525 (2000) (the WPA bears substantial similarities to Michigan's civil rights statutes).

This Court first addressed the WPA in *Hopkins v Midland,* 158 Mich App 361; 404 NW2d 744 (1987). At issue in *Hopkins* was whether a union grievance resulting in an arbitration decision in favor of the employer barred the plaintiff's subsequent WPA action. The Court held "that [the] plaintiff's failure to submit [his WPA] claims to arbitration does not act as res judicata or collateral estoppel . . . ." *Id.* at 366. The *Hopkins* Court reasoned that the rights and remedies accorded by the WPA are different from those of a collective bargaining agreement, noting that "the act creates rights belonging to individual employees, not collec-

---

[2] Generally, where statutory language is clear and unambiguous, the Legislature must have intended the meaning it clearly expressed, and the statute must be enforced as written; no further construction is required or permitted. *Anzaldua, supra* at 535. "A necessary corollary of these principles is that a court may read nothing into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute itself." *Roberts v Mecosta Co Gen Hosp,* 466 Mich 57, 63; 642 NW2d 663 (2002).

tively represented groups." *Id.* at 374-375. Consequently, "the arbitration proceeding [in *Hopkins*] was brought by [the] plaintiff's union, as is the usual case, to assert rights created under a collective bargaining agreement." *Id.* at 375. But, "a civil action may be required to achieve the act's goals." *Id.*

This Court reviewed *Hopkins* when faced with the question whether a whistleblower who reports a violation of the Michigan Occupational Safety and Health Act (MIOSHA), MCL 408.1001 *et seq.*, must bring the retaliation claim under MIOSHA. *Tyrna v Adamo, Inc*, 159 Mich App 592, 600; 407 NW2d 47 (1987). The *Tyrna* Court determined that the whistleblower did not have to do so and held "that an employee who reports a public health or safety violation to appropriate local authorities may maintain an action under the whistleblowers' act notwithstanding the fact that the employer's wrongful conduct also violates MIOSHA." *Id.* at 594. Although MIOSHA provides its own antiretaliation provision,[3] the *Tyrna* panel reasoned that the WPA had broader application and provided a wider panoply of legal and injunctive remedies. *Tyrna, supra* at 598-600. Because the Court found no conflict between MIOSHA and the WPA, the Court held that, without further legislative direction, the plaintiff could pursue his claim under either statute. *Tyrna, supra* at 600-601.

This Court applied similar reasoning in concluding that a settlement of a union grievance filed on behalf of a discharged employee did not bar an action alleging wrongful termination under the Persons With Disabili-

---

[3] We note that MCL 408.1065 provides for the filing of a complaint with the Department of Labor with an opportunity for judicial review and enforcement of the administrative agency's decision. In a case arising before the effective date of the WPA, this Court held that MIOSHA's administrative remedies were exclusive. *Ohlsen v DST Industries, Inc*, 111 Mich App 580, 584; 314 NW2d 699 (1981).

ties Civil Rights Act (formerly the Handicappers' Civil Rights Act), MCL 37.1101 *et seq.*, and the Civil Rights Act (CRA), MCL 37.2101 *et seq. Florence v Dep't of Social Services*, 215 Mich App 211, 216-217; 544 NW2d 723 (1996). The Court observed that a union has a duty to speak for its members with respect to the terms of a collective bargaining agreement, but a union does not have a similar duty to uphold rights its members possess independently of the collective bargaining agreement.[4] *Id.* at 214. The Court held that because the employee's contractual rights and statutory rights were distinctly separate, the employee had a right to proceed on her statutory claims regardless of the agreement that her union reached with respect to the contractual grievance. *Id.* at 214-216.

In sum, we hold that the trial court erred by ruling that plaintiff must have exhausted his administrative remedies, that is, by the filing of a union grievance, before he could invoke his statutory WPA rights. Our conclusion is consistent with the WPA's requirement that claims be brought promptly or not at all, with the statute's lack of any express or implied requirement for exhaustion of administrative remedies, and with a construction of the WPA "favoring the persons the Legislature intended to benefit." *Shallal, supra* at 611.

### B. ADVERSE EMPLOYMENT ACTION

We also hold that the trial court erred as a matter of law by implicitly ruling that plaintiff must show that he was fired, demoted, or transferred in order to state a

---

[4] We observe that plaintiff's report of a violation or a suspected violation of a law in this case implicated several fellow coworkers who might also be members of the same union. If so, the union would face a difficult conflict of interest by representing plaintiff regarding alleged retaliation for reporting wrongdoing.

viable WPA claim and that other bases, such as not getting a promotion or being threatened with employment action including discharge, were not sufficient. Plaintiff alleged, and supported by his deposition testimony, that Andrews referenced his September 2002 letter to the chief of police and told him to start looking for a job elsewhere if he kept "making waves" and wasting Andrews's time. Viewed in the light most favorable to plaintiff, this allegation and evidence support inferences that defendant Andrews threatened plaintiff with discharge in retaliation for his September letter.

MCL 15.362 provides:

> An employer shall not discharge, *threaten*, or *otherwise discriminate* against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action. [Emphasis added.]

Thus, the elements necessary to establish a prima facie case of a WPA violation are: "(1) that plaintiff was engaged in protected activities as defined by the act; (2) that plaintiff was subsequently discharged, threatened, or otherwise discriminated against; and (3) that a causal connection existed between the protected activity and the discharge, threat, or discrimination." *Phinney v Perlmutter*, 222 Mich App 513, 553; 564 NW2d 532 (1997). Here, plaintiff's allegation and testimony regarding Andrews's statement, viewed in the light most

favorable to plaintiff, support inferences that would be sufficient to satisfy elements 2 and 3, that is, reasonable jurors could find that defendant Andrews threatened plaintiff with discharge in retaliation for his September letter. See *id.* at 555-556. Accordingly, material disputed questions of fact exist regarding whether Andrews made the comment, whether it was a threat of discharge, and whether it was causally related to plaintiff's September 2002 letter. Summary disposition was therefore inappropriate. *West, supra* at 183.

Moreover, plaintiff alleges that as a result of his September letter, defendants significantly reduced his work responsibilities. In *Peña v Ingham Co Rd Comm*, 255 Mich App 299, 311; 660 NW2d 351 (2003), in the context of a retaliation claim under Michigan's CRA, this Court addressed what constitutes an adverse employment action. This Court "defined an adverse employment action as an employment decision that is materially adverse in that it is more than a mere inconvenience or an alteration of job responsibilities and that there must be some objective basis for demonstrating that the change is adverse because a plaintiff's subjective impressions as to the desirability of one position over another are not controlling." *Id.*, citing *Wilcoxon v Minnesota Mining & Mfg Co*, 235 Mich App 347, 364; 597 NW2d 250 (1999) (other citations and internal punctuation omitted). Further, although an exhaustive list of adverse employment actions does not exist, the *Peña* Court noted "typical" adverse employment actions include "a termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Peña, supra* at 312 (citations omitted).

The record here is insufficient to determine whether plaintiff presented sufficient evidence to establish a material question of fact regarding his allegation of "significantly diminished material responsibilities." Although plaintiff relies on Patel's April 2003 memorandum indicating other employees in the FOS were assigned more duties than he was, plaintiff acknowledged that his assigned duties were significant and entailed accounting for between $65 million to $80 million. Moreover, even if plaintiff's material responsibilities were significantly diminished, plaintiff must also establish a causal connection to his September 2002 letter. "Summary disposition for the defendant is appropriate when a plaintiff cannot factually demonstrate a causal link between the protected activity and the adverse employment action." *West, supra* at 184. This requires more than showing a mere temporal relationship between a protected activity and the alleged adverse employment action. *Id.* at 185-186, 186 n 12. Furthermore, in this case, there is a span of eight months between the protected activity and the alleged adverse employment action.

In addition, plaintiff alleges that his being socially isolated in the office creates a material question of fact regarding an adverse employment action. We find plaintiff's claim in this regard legally and factually deficient. In *Peña, supra* at 315, this Court held that the "type of ostracism or isolation [plaintiff alleges] is not the sort of conduct that rises to the level of an adverse employment action." Moreover, plaintiff admitted in his deposition that he regularly communicated by e-mail with his supervisor and maintained a "working relationship" with her. Further, plaintiff admitted that he also maintained a civil "working relationship" with his coworkers; consequently, this allegation fails as a matter of law and fact.

Plaintiff also argues on appeal that he was passed over for promotion in January 2003 and April 2003. Although a failure to promote, if motivated by an intent to retaliate for protected activity, may come within the protection of the WPA, see *Hopkins, supra* at 377-378, plaintiff alleged neither incident in his complaint. Other than noting that the limitations period expired on the January 2003 appointment of Patel before plaintiff filed his complaint, see n 1, we decline to address this appellate argument further.

### C. REPORT TO A PUBLIC BODY

Defendants argue, as an alternative basis for affirming the trial court decision, that plaintiff did not engage in a protected activity because his September 2002 letter to the chief of police and the mayor was merely a report submitted through the normal chain of command, not to a public body as required by the WPA. See *Dickson v Oakland Univ*, 171 Mich App 68, 71; 429 NW2d 640 (1988), overruled in part by *Dudewicz, supra* at 77. The trial court did not rule on this issue, but the issue presents a question of law, and we have before us the facts necessary to resolve the issue. See *Providence Hosp v Nat'l Labor Union Health & Welfare Fund*, 162 Mich App 191, 194-195; 412 NW2d 690 (1987). Accordingly, because this issue will arise on remand, we address it. To the extent that the WPA requires that a whistleblower report to a "public body" other than the whistleblower's employer, we hold that plaintiff satisfied the requirement by forwarding a copy of his September 2002 letter to the mayor.

We discern in the plain language of the WPA no exception for reporting a violation or a suspected violation of a law to a public body when the whistleblower is

also an employee of a public body.[5] We also discern no ambiguity permitting judicial construction. *Shallal, supra* at 612. Nevertheless, we feel constrained by our Supreme Court's partial approval in *Dudewicz* of the analysis in *Dickson*. In *Dickson*, the plaintiff was a police officer employed by the Oakland University Department of Public Safety. The plaintiff alleged that his superiors criticized him for not exercising more discretion before making an arrest. The plaintiff also alleged that his superiors declined to seek an arrest warrant for a university student after he reported being assaulted by the student. The *Dickson* Court reasoned that the WPA "is designed to protect employees who report suspected wrongdoing by their employer to a higher authority from retaliatory discharge." *Dickson, supra* at 70. The Court held that because the plaintiff only "reported the wrongdoing of students and others to his employer pursuant to his job function," his claim did not come within the meaning of the WPA. *Dickson, supra* at 71.

In *Dudewicz,* the plaintiff claimed that the defendant discriminated against him because he reported alleged criminal activity of a coemployee. The defendant argued that the WPA was limited to situations in which a whistle-blower reports alleged wrongdoing of his or her employer, not a fellow employee. The trial court agreed, relying on *Dickson*. Our Supreme Court, however, found no such limitation in the plain language of the statute. *Dudewicz, supra* at 74-76. The Court held that the *Dickson* Court erred by suggesting that the WPA was limited to protecting whistleblowers who report wrongdoing by employers. *Dudewicz, supra* at 77. But the Court also noted, that "the plaintiff in *Dickson* reported the violation only to his employer, not to a public body within the meaning of the

---

[5] See n 2.

WPA. On *these* facts, the panel correctly found that the WPA was inapplicable." *Id.* at 77 n 4.

We hold that on the facts of this case plaintiff's report to the mayor satisfies the requirement of *Dickson-Dudewicz*. Although the mayor is the chief executive officer of the city, of which the police department is a part, the mayor's office and the police department are separate "public bodies" as that term is defined in the WPA. Thus, a report to the mayor of wrongdoing within the police department constitutes a report to a "higher authority" under *Dickson-Dudewicz* and satisfies the statutory definition of "public body."

MCL 15.361(d) defines "public body," among other things, as:

> (*iii*) A county, city, township, village, intercounty, intercity, or regional governing body, a council, school district, special district, or municipal corporation, or a board, department, commission, council, agency, or any member or employee thereof.

> \* \* \*

> (*v*) A law enforcement agency or any member or employee of a law enforcement agency.

Just as the statute defines a "public body" as a "board, department, commission, council, agency," or "law enforcement agency," this Court too has recognized that an employee of a public body who reports a violation or a suspected violation of a law or regulation to a larger umbrella entity that is also a public body has made a report to a public body within the meaning of the WPA. For example, in *Phinney*, the plaintiff was a senior research associate at the Institute of Gerontology at the University of Michigan. The plaintiff reported the theft of her research to many University of Michi-

gan employees. This Court held that the University of Michigan was a "public body" as defined by the WPA and that her report to the U of M satisfied any requirement that the plaintiff whistleblower must report to a "higher authority." *Phinney, supra* at 555.

In sum, to the extent that the WPA requires a whistleblower who is an employee of a public body to report a violation or a suspected violation of a law or regulation to a different public body, plaintiff has satisfied that requirement here.

### D. PLAINTIFF'S CLAIM TO SUMMARY DISPOSITION

Plaintiff argues that the trial court should have granted him summary disposition on his WPA claim because he established a prima facie case of a violation of the act that defendants failed to rebut. We disagree.

When considering claims under the WPA, this Court applies the burden-shifting analysis used in retaliatory discharge claims under Michigan's Civil Rights Act. *Roulston, supra* at 280-281. Accordingly,

> the plaintiff bears the initial burden of establishing a prima facie case of retaliatory discharge. If the plaintiff succeeds, the burden shifts to the defendant to articulate a legitimate business reason for the discharge. If the defendant produces evidence establishing the existence of a legitimate reason for the discharge, the plaintiff must have an opportunity to prove that the legitimate reason offered by the defendant was not the true reason, but was only a pretext for the discharge. [*Id.* (citations omitted).]

As discussed in part III(B), plaintiff pleaded and factually supported at least one alleged WPA violation. But this conclusion is reached when the evidence plaintiff submitted is viewed in the light most favorable to him, as it must be on defendant's MCR 2.116(C)(10) motion for summary disposition. A presumptive view-

ing of the evidence in plaintiff's favor is not the same as concluding that reasonable minds could not differ regarding the conclusions to be drawn from the evidence. *West, supra* at 183. Accordingly, the trial court did not err in declining to grant plaintiff summary disposition on his WPA claim.

### IV. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

We hold that the trial court properly dismissed plaintiff's claim for intentional infliction of emotional distress.

Although our Supreme Court has not formally recognized this tort, in recent years, we have. See, e.g., *Nelson v Ho*, 222 Mich App 74, 85 n 6; 564 NW2d 482 (1997), citing *Roberts v Auto-Owners Ins Co*, 422 Mich 594; 374 NW2d 905 (1985).

> In order to establish intentional or reckless infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. Liability attaches only when a plaintiff can demonstrate that the defendant's conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. A defendant is not liable for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. [*Lewis v LeGrow*, 258 Mich App 175, 196; 670 NW2d 675 (2003) (citations and internal punctuation omitted).]

To determine whether conduct is so extreme and outrageous that it would trigger liability, one must consider whether relating the facts of the case to an average member of the community " 'would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" ' " *Auto-Owners, supra* at 603, quoting

2 Restatement Torts, 2d, § 46, comment d, p 73. Because reasonable minds could not differ and would conclude that defendants' alleged conduct that forms the basis of plaintiff's claim is not "outrageous," the court properly granted summary disposition. *West, supra* at 183.

Moreover, to the extent that plaintiff can prove damages as result of emotional distress causally related to a WPA violation, his exclusive remedy lies in the WPA. See *Dudewicz, supra* at 78-79. See, also, *Phinney, supra* at 560, holding that "emotional distress damages are awardable in a claim brought under the WPA."

### V. CONCLUSION

Because the trial court erred as a matter of law when it applied the doctrine of exhaustion of other remedies to plaintiff's WPA claim, and an erroneous standard regarding what may constitute an adverse employment action within the meaning of the WPA, we affirm in part, reverse in part, vacate the trial court's order granting summary disposition to defendants, and remand this case to the trial court for further proceedings consistent with this opinion. We leave to the trial court's discretion whether to grant the parties additional time for discovery. We do not retain jurisdiction. No costs may be awarded because neither party completely prevailed.