BROWN v MAYOR OF DETROIT

Docket Nos. 259911, 259923. Submitted April 6, 2006, at Lansing. Decided July 27, 2006, at 9:00 a.m. Leave to appeal sought.

Harold C. Nelthrope and Gary A. Brown brought two actions in the Wayne Circuit Court against Detroit mayor Kwame Kilpatrick and the city of Detroit. One action alleged slander and the other action alleged a violation of the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.* Nelthrope, a Detroit police officer, took an extended leave of absence from work after being publicly identified as the source of allegations regarding suspected wrongful conduct by his former coworkers in the mayor's executive protection unit, after which the mayor called Nelthrope a liar in a televised interview. The mayor fired Brown from his position as deputy chief of the police department's Professional Accountability Bureau after Brown authorized a preliminary investigation based on Nelthrope's allegations, then told the media that Brown's dismissal was due to breach of trust and Brown's lack of professionalism. The trial court, Michael J. Callahan, J., denied the defendants' motions for summary disposition on the plaintiffs' WPA claims and granted partial summary disposition with respect to Nelthrope's WPA claim. The trial court also denied the defendants' motion for summary disposition with respect to the plaintiffs' slander claims. The defendants appealed these rulings, and the cases were consolidated.

The Court of Appeals *held*:

1. The trial court properly denied the defendants' motion for summary disposition of Nelthrope's WPA claim because the public identification of Nelthrope as a whistleblower, and the mayor's televised remarks calling Nelthrope a liar and expressing hope that Nelthrope's wife and children were watching the broadcast, presented a question of fact regarding whether Nelthrope had suffered an adverse employment action.

2. The trial court erred in granting Nelthrope's motion for summary disposition of his WPA claim because there was conflicting evidence regarding whether the defendants released Nelthrope's name to the media for retaliatory purposes.

3. The trial court properly denied the defendants' motion for summary disposition of the WPA claims on the asserted ground that the plaintiffs were not engaged in a protected activity under the WPA. Nelthrope claimed to have reported the alleged misconduct to the Federal Bureau of Investigation, and Brown presented evidence that his memorandum regarding the alleged misconduct was drafted for the purpose of reporting the allegations to the mayor's office, thereby presenting a factual question whether the plaintiffs reported the alleged misconduct to a higher authority that is also a separate public body from the Detroit police department. The fact that Brown was required to report the alleged misconduct as part of his job duties is irrelevant because the WPA applies to misconduct reported in the course of a plaintiff's employment.

4. Although the defendants asserted legitimate, nonretaliatory reasons for terminating Brown's employment, summary disposition of Brown's WPA claim was inappropriate because Brown presented evidence to show that the defendants' stated reasons were unworthy of credence.

5. Mayor Kilpatrick is immune from liability for plaintiffs' slander claims regardless of whether he intended to lie or mislead the public because he made the arguably defamatory remarks about the plaintiffs while answering questions about police department investigations and Brown's dismissal, and was therefore acting within the scope of his authority as mayor.

Affirmed in part, reversed in part, and remanded for further proceedings.

1. MASTER AND SERVANT — WHISTLEBLOWERS' PROTECTION ACT — PROTECTED ACTIVITY — REPORTING TO SEPARATE HIGHER AUTHORITY.

The mayor's office and the Federal Bureau of Investigation are separate public bodies to which a city police officer may report misconduct by coworkers and be protected by the Whistleblowers' Protection Act against retaliatory action for making the report (MCL 15.361[d], 15.362).

2. MASTER AND SERVANT — WHISTLEBLOWERS' PROTECTION ACT — PROTECTED ACTIVITY — SCOPE OF EMPLOYMENT.

The Whistleblowers' Protection Act applies to an employee's report of coworker misconduct even if the employee is required to make the report within the course of his or her employment (MCL 15.362).

3. GOVERNMENTAL IMMUNITY — EXECUTIVE OFFICIALS — SCOPE OF AUTHORITY.

The highest executive official of a local unit of government is acting within the scope of his or her authority when responding to

questions relating to the governmental unit's functions and is therefore immune from tort liability for that response.

*Stefani & Stefani, Professional Corporation* (by *Michael L. Stefani, Brady G. Stefani,* and *Frank J. Rivers*), for the plaintiffs.

*Barris, Sott, Denn & Driker, P.L.L.C.* (by *Morley Witus* and *Lindsay Buiting*), *Valerie A. Colbert-Osamuede,* and *Lewis & Munday, P.C.* (by *Samuel E. McCargo*), for the Mayor of Detroit.

*Barris, Sott, Denn & Driker, P.L.L.C.* (by *Morley Witus* and *Lindsay Buiting*), *Valerie A. Colbert-Osamuede,* and *Grier & Copeland, P.C.* (by *Wilson A. Copeland, II*), for the city of Detroit.

Before: NEFF, P.J., and SAAD and BANDSTRA, JJ.

PER CURIAM. In Docket No. 259911, defendants Mayor Kwame Kilpatrick and the City of Detroit appeal the trial court's order that denied their motions for summary disposition on plaintiffs Gary Brown and Harold Nelthrope's claims under the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.,* and granted Harold Nelthrope's motion for partial summary disposition on his WPA claim. In Docket No. 259923, Mayor Kilpatrick appeals the trial court's order that denied his motion for summary disposition on Brown and Nelthrope's slander claims. We affirm in part, reverse in part, and remand for further proceedings.

### I. FACTS AND PROCEDURAL HISTORY

As a Detroit Police Officer, Nelthrope worked in Mayor Kilpatrick's Executive Protection Unit (EPU) from January 2002 through February 2003, when he

was transferred to the 7th Precinct. In March 2003, Officer Nelthrope contacted the Professional Accountability Bureau[1] (PAB) of the Detroit Police Department to disclose information about suspected illegal or wrongful conduct by EPU Officer Loronzo "Greg" Jones and Officer Michael Martin.[2] In April 2003, Lieutenant Roosevelt Lawrence and Inspector Fred McClure of the PAB interviewed Officer Nelthrope about his allegations and he was interviewed a second time by Sergeant Shawn Wesley of the Public Corruption Unit. Around the time Officer Nelthrope's allegations arose, the PAB was also conducting an unrelated investigation of Jones because Jones's brother was arrested and, in his wallet, he was carrying the official shield from Jones's Detroit Police Department cap.

Gary Brown was a deputy chief in the PAB at the time Officer Nelthrope made his claims. According to Deputy Chief Brown, he authorized a preliminary investigation into Nelthrope's allegations and, on two occasions, he discussed the allegations with then Chief of Police Jerry Oliver. Specifically, Deputy Chief Brown testified that he told Chief Oliver about Officer Nelthrope's information in late March or the first week in April 2003. Deputy Chief Brown further testified that on Monday, May 5, 2003, Chief Oliver told him that the mayor's office was angry about the PAB's inquiries involving the EPU officers and that Mayor Kilpatrick's chief of staff, Christine Beatty, requested a report on the status of the investigation. Brown maintains that he told Chief Oliver that his staff

---

[1] The Professional Accountability Bureau is akin to what is commonly known as "Internal Affairs." Detroit's Professional Accountability Bureau included both an internal affairs section and a public corruption section.

[2] Jones, who ran the EPU, attended Cass Technical High School with Mayor Kilpatrick and his chief of staff, Christine Beatty. According to Nelthrope, Martin was a friend of Jones and he became the "de facto" second in command of the EPU.

was preparing a comprehensive memorandum on all of Officer Nelthrope's allegations, but Oliver instead directed him to draft a brief, bullet-point memorandum on any investigation related to the EPU officers. Chief Oliver testified that, while he was aware of Officer Nelthrope's allegations from prior discussions with Deputy Chief Brown, he did not remember that Brown told him he had a more comprehensive memorandum. However, Chief Oliver recalled that, at Beatty's request, he asked Brown to draft a memorandum about Officer Nelthrope's allegations and any investigation the PAB had conducted on the EPU officers.

The two memorandums described above are at the center of the allegations in this case. In April 2003, Sergeant Wesley and PAB Lieutenant Brian Stair drafted a five-page memorandum that described Officer Nelthrope's allegations and listed Deputy Chief Brown as the author. The memorandum states that, according to Officer Nelthrope, at the end of 2002 or the beginning of 2003, Officer Jones struck a parked vehicle after he left the Half Past 3 nightclub in a sport utility vehicle (SUV) assigned to the EPU. Officer Nelthrope stated that Officer Jones failed to report the incident and that Jones paid for the SUV repairs himself. Officer Nelthrope also reported that, on February 7, 2003, Officer Martin left his post during work hours and drank alcohol at a party held at the Half Past 3 nightclub. Officer Nelthrope stated that, when Officer Martin left the party, he crashed his car, which was also assigned to the EPU. Officer Nelthrope told the PAB officers that Officer Martin ordered an EPU officer to his home to change a flat tire on the car and that the officer observed that the vehicle had three flat tires and other damage. The officer also noted that Martin appeared to be intoxicated and that he left his weapon in the car.

Officer Martin told the officer that he hit something in the street. Workers at the garage at which the car was repaired told PAB officers that the car had three flat tires and undercarriage damage. Officer Martin did not file a report about the accident.

Officer Nelthrope further alleged that both Officers Jones and Martin often spent time at the Half Past 3 nightclub during work hours. The report also stated that Officers Jones and Martin sought and received overtime pay for as much as 50 or 60 hours of overtime per pay period when they failed to work even their regular shifts. Officer Nelthrope also reported that a private party took place at the Manoogian Mansion[3] before the Kilpatricks made this their residence. According to Officer Nelthrope, Mayor Kwame Kilpatrick attended the party and the party featured nude female dancers. The report further states:

> Officer Nelthrope alleges that Mrs. [Carlita] Kilpatrick arrived unexpectedly at the mansion and observed Mayor Kilpatrick, his friends and the dancers. He further stated that a fight ensued between M[r]s. Kilpatrick and a dancer and that the dancer received injuries requiring medical attention. It is alleged that the dancer was treated at St. John's hospital and the Executive Protection Unit confiscated all activity log sheets from the Seventh Precinct.[4]

The concluding paragraph of the memorandum states that, at Chief Oliver's direction, the PAB was prepared to conduct an investigation into the allegations.

As noted, Chief Oliver instructed Deputy Chief Brown to draft a bullet-point memorandum on the EPU officer investigations only so that Oliver could convey

---

[3] The Manoogian Mansion is the official residence of the Mayor of Detroit and is maintained by Detroit taxpayers.

[4] Eventually, this alleged incident at the Manoogian Mansion became widely publicized in the metropolitan Detroit media.

the information to Beatty. According to Deputy Chief Brown, he drafted a two-page memorandum, Chief Oliver asked him to make certain editorial changes, Brown made the changes, and he gave the completed memorandum to Oliver. The memorandum states, in bullet-point form, that PAB officers interviewed Officer Nelthrope on March 28, 2003, and that Nelthrope alleged that (1) Officer Jones was involved in an accident while driving his EPU vehicle, (2) Officer Martin left his post to attend a nightclub party, Martin was seen drinking alcohol at the party, and, after the party, Martin was involved in an accident while driving his EPU vehicle, and (3) Jones and Martin received overtime pay for hours they did not work. The memorandum did not contain any allegations regarding the Manoogian Mansion party or Carlita Kilpatrick's alleged assault on the nude dancer. The concluding paragraph of the two-page memorandum stated that the disciplinary issues could be addressed with "proactive supervision" and, "unless directed by the Chief of Police, no further action will be taken regarding these issues." Deputy Chief Brown signed the memorandum and, at the bottom of the document, Oliver drafted and signed a handwritten note, dated May 6, 2003, that stated, "No further investigation directed at this time."

Chief Oliver testified that, after Deputy Chief Brown gave him the memorandum, Oliver stamped "CONFIDENTIAL" on the document and gave it to Beatty on May 6, 2003. According to Chief Oliver, when he gave Beatty the memorandum, Beatty was primarily interested in any investigation related to the Manoogian Mansion party. In her deposition, Beatty denied that she requested a memorandum about Officer Nelthrope's allegations of misconduct by the EPU officers and she maintained that she was surprised to receive it. She further testified that after Chief Oliver gave her the memorandum, she received an

anonymous letter marked "confidential" under her office door or in her office mailbox. According to Beatty, the anonymous document "outlin[ed] some things that then Deputy Chief Gary Brown was doing or conducting that was [sic] unauthorized." Beatty clarified that the document did not specifically refer to an investigation about the Manoogian Mansion party or to EPU officer investigations, but stated that Deputy Chief Brown was conducting an "unauthorized investigation."

Beatty testified that, in a ten-minute conversation, she told Mayor Kilpatrick about the memorandum from Deputy Chief Brown and Chief Oliver a day or two after she received it. According to Beatty, she advised Mayor Kilpatrick that Chief Oliver recommended no further investigation about the EPU officers. However, Beatty told Mayor Kilpatrick about the anonymous document she received and she recommended that Brown be removed as deputy chief. Beatty testified that she did not show the anonymous document to Mayor Kilpatrick because she destroyed it before she disclosed its existence to him.

Beatty maintained that she did not recommend Brown's removal as deputy chief only because of the anonymous document, but also because she was concerned about the timing of her receipt of the contradictory anonymous document when she had just received the *unsolicited* May 6, 2003, memorandum about the EPU officer investigations. Beatty testified that, because Deputy Chief Brown was in such a sensitive position, she believed that the matter should be examined immediately. However, Beatty conceded that she did not investigate what occurred and simply recommended that Deputy Chief Brown be removed from his position at the PAB.

Mayor Kilpatrick testified that, on May 6, 2003, Beatty talked to him about the PAB's investigation of Officers Jones and Martin, but she did not mention that Officer Nelthrope raised the allegations or that the allegations came from a former EPU officer. According to Mayor Kilpatrick, he and Beatty met again about the matter and Beatty disclosed that she received anonymous information that Brown was conducting an unauthorized investigation of which Chief Oliver was unaware. Mayor Kilpatrick maintained that Beatty did not specify the nature of those investigations and he and Beatty did not discuss anything related to the Manoogian Mansion party. Mayor Kilpatrick then clarified that Beatty told him that the anonymous document stated that Deputy Chief Brown was conducting investigations "about all kinds of things" but he did not recall if Beatty gave him any specifics. Mayor Kilpatrick testified that Beatty recommended that he remove Deputy Chief Brown from the PAB, but she did not recommend that he revoke his appointment as a deputy chief. According to Mayor Kilpatrick, he did not immediately agree with Beatty that Brown should be removed and he told Beatty that he would "get back" to her.

Mayor Kilpatrick testified that he then called Chief Oliver and Oliver told him that he did not know that Deputy Chief Brown was conducting *any* investigations. Mayor Kilpatrick maintained that Chief Oliver only knew about "some paper that he gave Christine [Beatty] at a directors meeting," apparently referring to the two-page memo of May 6, 2003. Mayor Kilpatrick also stated that Chief Oliver said he knew nothing about any investigations of Officers Jones and Martin except the cap shield investigation involving Officer Jones. As noted, Chief Oliver testified to the contrary and stated that he and Deputy Chief

Brown discussed Officer Nelthrope's allegations, including the Manoogian Mansion party allegations, and that he directed Brown to draft the two-page memorandum for Beatty.

Nonetheless, according to Mayor Kilpatrick, after he talked to Chief Oliver, he personally deliberated about the matter and concluded that he had lost confidence in Deputy Chief Brown as a leader in the PAB and his ability to "move that department forward." He was concerned that Deputy Chief Brown failed to follow the chain of command because Brown did not tell Chief Oliver about the EPU officer investigations. Further, Mayor Kilpatrick testified that he trusted Beatty as his chief of staff and that she came to him with information that was anonymous but it had "unbelievable credibility."

Mayor Kilpatrick met with Beatty and Chief Oliver on Friday, May 9, 2003, and he told them that he decided to "unappoint" Brown as deputy chief of the PAB. According to Chief Oliver, he was surprised about Mayor Kilpatrick's decision and Mayor Kilpatrick declined to tell him why he made it. Chief Oliver recalled that Mayor Kilpatrick referred to some "information" that he had that Chief Oliver did not have, and Mayor Kilpatrick gave him Deputy Chief Brown's termination letter. In the late afternoon on May 9, 2003, Chief Oliver gave the letter to Deputy Chief Brown. The letter was signed by Mayor Kilpatrick and stated, in pertinent part:

> I would like to take the opportunity to thank you for all of your efforts on behalf of the City of Detroit. I know your services here have been an integral part of the progress the city has made.
>
> I must inform you that effective today, you are hereby relieved of your appointment as Deputy Chief in the Detroit Police Department. [Emphasis in original.]

Brown's removal as deputy chief garnered much attention from the local press. The record indicates that Deputy Chief Brown or his representative disclosed to the media the five-page memorandum that outlined Officer Nelthrope's allegations and included the reference to the Manoogian Mansion party. The memorandum was redacted, however, and did not name Nelthrope as the officer who made the allegations.

Officer Nelthrope's claims in this case center on the disclosure by the mayor's office of an unredacted version of the two-page memorandum that Detroit's media consultant, defendant Robert Berg, sent to several media outlets on May 14, 2003. Beatty testified that she agreed with Berg that the media should be made aware of the contents of the two-page memorandum. However, both Berg and Beatty maintain that they never discussed whether Officer Nelthrope's name would be released along with the memorandum. In contrast, Mayor Kilpatrick testified that he did not believe anyone from his office was responsible for the release of the two-page memorandum that contained Officer Nelthrope's name.

Officer Nelthrope maintains that, on the day Berg released the two-page memorandum, he arrived at his home with his eight-year-old son and saw several news reporters and cameras at his house. According to Officer Nelthrope, not only did the release of the memorandum expose him as a whistleblower, the television reports showed his address during their broadcasts. Officer Nelthrope testified that, with his supervisor's permission, he went on sick leave the next day because the exposure of his name and address to the media made him fear for his life. It appears that Officer Nelthrope was on sick leave, then disability leave, during most of the lower court proceedings, and he has not returned to work.

Mayor Kilpatrick was visiting Washington, D.C., shortly after the release of the memorandums and Officer Nelthrope's name, and a Detroit television reporter asked Mayor Kilpatrick to comment on the events. Though a videotape of Mayor Kilpatrick's comments is not included in the record sent to this Court, Mayor Kilpatrick admits that he called Officer Nelthrope's allegations lies, that he called Nelthrope a liar, and that he said he hoped Nelthrope's wife and children were watching the television broadcast. Officer Nelthrope asserts that Mayor Kilpatrick's comments constitute slander and a threat. Mayor Kilpatrick, on the other hand, denies that he intended his comments to be threatening to Officer Nelthrope or his family. Deputy Chief Brown also alleges that Mayor Kilpatrick, Chief Oliver, and the city of Detroit slandered him when they told the press that he was terminated for breach of trust, for being unprofessional, and for conducting unauthorized investigations, and that it was Brown who leaked the confidential memorandum containing Officer Nelthrope's name to the news media.

On June 2, 2003, Deputy Chief Brown and Officer Nelthrope filed a complaint in the Wayne Circuit Court against Chief Jerry Oliver, Mayor Kwame Kilpatrick, Robert Berg, and the city of Detroit. As noted, Deputy Chief Brown and Officer Nelthrope asserted claims of slander and violation of the WPA. Both plaintiffs argued that Mayor Kilpatrick and his administration discriminated against them for reporting the suspected misconduct outlined in the memorandums. During the litigation, plaintiffs presented evidence that Mayor Kilpatrick also discriminated against them because he feared they would reveal other misconduct, including that Kilpatrick misused EPU officers by requiring them to assist him in engaging in extramarital affairs. The

parties filed numerous motions for summary disposition and plaintiffs' claims against Chief Oliver and Berg were ultimately dismissed.

With regard to Deputy Chief Brown, the trial court denied the motions for summary disposition on his WPA claims against Mayor Kilpatrick and Detroit, and it denied the motions for summary disposition on his slander claim against Mayor Kilpatrick. However, the trial court granted summary disposition to Detroit on Deputy Chief Brown's slander claim because it did not fall within an exception to governmental immunity. With regard to Officer Nelthrope, the trial court also granted summary disposition to Detroit on his slander claim because Detroit is immune from suit under the governmental tort liability act. The trial court denied summary disposition to Mayor Kilpatrick on Officer Nelthrope's slander claim and denied Detroit's motion for summary disposition on Nelthrope's claim under the WPA. However, the trial court granted summary disposition to Officer Nelthrope on his WPA claim against Mayor Kilpatrick and ruled that the jury should consider only the issue of damages.

According to Officer Nelthrope and Deputy Chief Brown, the upshot of these complex facts is that two seasoned, well-respected police officers who reported suspected misconduct are no longer employed by the Detroit Police Department and were maligned in the press by the mayor. Officer Nelthrope contends that he was publicly branded as a liar and an enemy of the mayor, he could not continue as a Detroit police officer, and his family was made part of the public story. Deputy Chief Brown maintains that he was "unappointed" in an inherently implausible scenario cynically concocted by Mayor Kilpatrick and his chief of staff. According to both plaintiffs, because the allegations implicated the

mayor, his friends, and his family, the mayor discredited plaintiffs and, in effect, relieved them of their duties in order to minimize the damage to his own reputation. In contrast, Mayor Kilpatrick and Detroit maintain that they had legitimate, nondiscriminatory reasons for exposing Officer Nelthrope as the person responsible for reporting the alleged misconduct, and for "unappointing" Brown, who carried out and reported on the initial inquiry into the allegations. Accordingly, the administration asserts that it cannot be held liable for these actions and the subsequent comments of Mayor Kilpatrick.

## II. ANALYSIS

### A. ADVERSE EMPLOYMENT ACTION AND OFFICER NELTHROPE

Mayor Kilpatrick and Detroit contend that the trial court erred when it denied their motion for summary disposition and granted summary disposition to Officer Nelthrope on his WPA claim because, they argue, Officer Nelthrope did not suffer an adverse job action. This Court reviews the grant or denial of a motion for summary disposition de novo. *Heckmann v Detroit Chief of Police*, 267 Mich App 480, 486; 705 NW2d 689 (2005). MCL 15.362 of the WPA provides:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a

public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

In *Heckmann, supra* at 491, this Court stated:

> [T]he elements necessary to establish a prima facie case of a WPA violation are: "(1) that plaintiff was engaged in protected activities as defined by the act; (2) that plaintiff was subsequently discharged, threatened, or otherwise discriminated against; and (3) that a causal connection existed between the protected activity and the discharge, threat, or discrimination." [Quoting *Phinney v Perlmutter*, 222 Mich App 513, 553; 564 NW2d 532 (1997).]

"The determination whether the evidence established a prima facie case under the WPA is a question of law to be determined de novo." *Phinney, supra* at 553.

Officer Nelthrope argues that the release of his name to the media and the exposure of his family constitutes an adverse employment action under the WPA. The plain language of the statute and our case law forbid an employer from threatening or "otherwise discriminat-[ing]" against a whistleblower, even if the employee is not terminated outright from his position. See, e.g., *Heckmann, supra* at 491-492. Further, it is well settled that "[r]emedial statutes such as the WPA are to be liberally construed in favor of the persons intended to be benefited." *Phinney, supra* at 555. However, the statute also plainly states that the adverse employment action must relate to "compensation, terms, conditions, location, or privileges of employment." MCL 15.362.

Our courts have defined an "adverse employment action" in both Civil Rights Act and WPA claims " 'as an employment decision that is materially adverse in that it is more than a mere inconvenience or an alteration of job responsibilities . . . .' " *Heckmann, supra* at 492, quoting *Peña v Ingham Co Rd Comm*, 255 Mich App 299, 311; 660 NW2d 351 (2003). Again, Officer Nel-

thrope does not assert that defendants altered his compensation, or the terms, location, or privileges of his job, but he maintains that the release of his name made the conditions of his employment so intolerable that he was forced to leave his position.

The record reflects that Officer Nelthrope went on sick leave from the 7th Precinct shortly after his name was released and television news reporters interviewed him at his home. Officer Nelthrope argued to the trial court that he was constructively discharged because he was identified as a whistleblower. As our Supreme Court explained in *Champion v Nation Wide Security, Inc*, 450 Mich 702, 710; 545 NW2d 596 (1996): "It is well established that the law does not differentiate between employees who are actually discharged and those who are constructively discharged. In other words, once individuals establish their constructive discharge, they are treated as if their employer had actually fired them." However, it is also well settled that "a constructive discharge occurs only where an employer or its agent's conduct is so severe that a reasonable person in the employee's place would feel compelled to resign." *Id.*

As this Court advised in *Peña, supra*, the determination whether an adverse employment action occurred also depends on " '*other indices that might be unique to a particular situation.*' " *Id.* at 312, quoting *White v Burlington N & SFR Co*, 310 F3d 443, 450 (CA 6, 2002) (emphasis added). As a practical matter, there is little doubt that the release of Officer Nelthrope's identity by the mayor's office was tantamount to a career-ending blow to Nelthrope. Further, in his television interview, Mayor Kilpatrick declined to apologize for releasing Officer Nelthrope's name and, in essence, expressed satisfaction that his administration exposed Nelthrope

as a whistleblower. Moreover, Mayor Kilpatrick admits that, after he called Officer Nelthrope a liar, he said he hoped Nelthrope's wife and children were watching the broadcast. As Mayor Kilpatrick explained in his deposition:

> I wanted to point out to the entire citizenry of the city of Detroit that Officer Nelthrope who was a person who started these rumors, these lies about me and my family, was being dishonorable in that act. And when I said everyone I definitely wanted that to include the people right around him, his family. I thought they needed to know that.

We hold that a reasonable juror could interpret Mayor Kilpatrick's statement and the exposure of Officer Nelthrope and his family as not only threatening, but enough to undermine Nelthrope's ability to continue working as a Detroit police officer. Under these unique circumstances, and given the amount of media attention involved, it is difficult to imagine how Officer Nelthrope could effectively carry out his duties "to the entire citizenry of the city of Detroit" when he has been labeled a liar by the mayor and has been exposed as a whistleblower about conduct of the mayor, his wife, and his friends. In this highly charged environment, it is feasible that Officer Nel-thrope would fear for his safety and that of his family should he continue to work as a Detroit police officer. Therefore, the trial court correctly denied Mayor Kilpatrick and Detroit's motion for summary disposition with respect to the issue whether the conduct of the Kilpatrick administration toward Officer Nelthrope rises to the level of an adverse employment action.

### B. RETALIATORY MOTIVE AND OFFICER NELTHROPE

Mayor Kilpatrick and Detroit also assert that they presented sufficient evidence to establish a jury-

submissible issue concerning whether Officer Nelthrope's name was released to the press for legitimate, rather than retaliatory, reasons. "When considering claims under the WPA, this Court applies the burden-shifting analysis used in retaliatory discharge claims under Michigan's Civil Rights Act." *Heckmann, supra* at 497. As the *Heckmann* Court further explained:

> "[T]he plaintiff bears the initial burden of establishing a prima facie case of retaliatory discharge. If the plaintiff succeeds, the burden shifts to the defendant to articulate a legitimate business reason for the discharge. If the defendant produces evidence establishing the existence of a legitimate reason for the discharge, the plaintiff must have an opportunity to prove that the legitimate reason offered by the defendant was not the true reason, but was only a pretext for the discharge." [*Id.*, quoting *Roulston v Tendercare (Michigan), Inc*, 239 Mich App 270, 280-281; 608 NW2d 525 (2000).]

As noted, after his employment was terminated, Brown gave the press a copy of the five-page memorandum that outlined Officer Nelthrope's allegations against the EPU officers and those surrounding the Manoogian Mansion party. However, the memorandum was redacted so that it did not disclose Officer Nelthrope's name. Berg testified that he met with Mayor Kilpatrick and Beatty to discuss the administration's potential response to Brown's disclosure of the five-page memorandum. Berg also testified that he attended a 1½-hour meeting with Beatty, a city attorney, and Mayor Kilpatrick's press secretary and came to a consensus that they should release the two-page memorandum to the press. Indeed, though she denies discussing whether Officer Nelthrope's name should be removed, Beatty testified that she directed Berg to release the information to the press. The release to the press occurred just days after the administration received the

two-page memorandum, which clearly identified Officer Nelthrope as the whistleblower.

However, defendants maintain that it was a necessary and legitimate decision to release the two-page memorandum because it directly conflicts with the five-page memorandum, and the conflict established to the public that Deputy Chief Brown was conducting unauthorized investigations. In response, Officer Nelthrope argues that defendants' explanation for the release of his name is not worthy of credence. To respond to evidence of a legitimate, nonretaliatory reason, Nelthrope was required to show that defendants' reason was pretext and that they were actually motivated by a discriminatory animus. *Hall v McRea Corp*, 238 Mich App 361, 371; 605 NW2d 354 (1999). "The plaintiff may meet her burden of showing pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " *Phinney, supra* at 563, quoting *Hopkins v Midland*, 158 Mich App 361, 380; 404 NW2d 744 (1987).

We hold that the trial court should have left it for the jury to decide whether Officer Nelthrope presented sufficient evidence to impose liability on defendants. Defendants showed that both Beatty and Berg testified that they had no intention of retaliating against Officer Nelthrope by releasing his name and that they had not discussed whether Officer Nelthrope's name should be included or redacted from the memorandum. While it appears that the trial court understandably rejected defendants' explanation as wholly improbable, if a party submits documentary evidence to support his or her position, the jury should decide issues of credibility. *SSC Associates Ltd Partnership v Gen Retirement Sys of*

*Detroit*, 192 Mich App 360, 365; 480 NW2d 275 (1991) ("The trial court must not usurp a trial jury's right . . . to determine the affiant's credibility. Moreover, summary disposition is especially suspect where motive and intent are at issue, or where the credibility of a witness or deponent is crucial." [Citation omitted.]).

In sum, Officer Nelthrope presented sufficient evidence of an adverse employment action under the WPA to survive defendants' motions for summary disposition. Also, the parties presented conflicting evidence with regard to whether defendants released Officer Nelthrope's name to the media for retaliatory purposes. Accordingly, we affirm the trial court's denial of summary disposition to Detroit, but reverse the trial court's grant of summary disposition to Officer Nelthrope on his WPA claim against Mayor Kilpatrick. We remand this matter for trial on all elements of Officer Nelthrope's WPA claim against both Detroit and Mayor Kilpatrick.

### C. PROTECTED ACTIVITY

Defendants assert that the trial court should have granted summary disposition to defendants because Deputy Chief Brown and Officer Nelthrope were not engaged in a protected activity under the WPA. Specifically, defendants maintain that, because Deputy Chief Brown merely reported Officer Nelthrope's allegations to Chief Oliver, as required by his job duties, he was not blowing the whistle to a higher authority as contemplated by the WPA. The WPA, MCL 15.362, provides: "An employer shall not discharge, threaten, or otherwise discriminate against an employee . . . because the employee . . . reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule . . . to a public body . . . ."

MCL 15.361(d) provides that "public body" means:

> (i) A state officer, employee, agency, department, division, bureau, board, commission, council, authority, or other body in the executive branch of state government.

> (ii) An agency, board, commission, council, member, or employee of the legislative branch of state government.

> (iii) A county, city, township, village, intercounty, intercity, or regional governing body, a council, school district, special district, or municipal corporation, or a board, department, commission, council, agency, or any member or employee thereof.

> (iv) Any other body which is created by state or local authority or which is primarily funded by or through state or local authority, or any member or employee of that body.

> (v) A law enforcement agency or any member or employee of a law enforcement agency.

> (vi) The judiciary and any member or employee of the judiciary.

"[A] law enforcement agency qualifies as a 'public body' " under 15.361(d)(v). *Henry v Detroit*, 234 Mich App 405, 412; 594 NW2d 107 (1999).

Defendants rely on *Dickson v Oakland Univ*, 171 Mich App 68; 429 NW2d 640 (1988), to support their position. In *Dickson*, the plaintiff, an Oakland University police officer, claimed that his employment was terminated because he arrested university students for drinking and driving and because, in a separate incident, he sought an arrest warrant for a student who assaulted him. *Id.* at 69. This Court ruled that the plaintiff failed to state a cause of action under the WPA:

> Plaintiff reported the wrongdoing of students and others to his employer pursuant to his job function. Nothing in the complaint indicates that the employer was in violation of the law or that plaintiff was fired for reporting the employer's violation of the law to a higher authority. In

essence, the complaint indicates that plaintiff's superiors suggested he exercise restraint in arresting individuals and also indicates that the university exercised its discretion in determining not to pursue an assault and battery warrant. We do not believe the act covers the instant facts. [*Id.* at 71.]

According to defendants, the above language suggests that if a plaintiff acts within the scope of his or her employment and reports the misconduct only to his or her employer, the WPA does not apply.

In *Dudewicz v Norris Schmid, Inc*, 443 Mich 68; 503 NW2d 645 (1993), the plaintiff reported to a manager and to the police that another employee assaulted him. *Id.* at 71. His employer asked the plaintiff to leave the premises, and the plaintiff argued that he believed that his employment was terminated. *Id.* Our Supreme Court held that, contrary to the reasoning of the panel in *Dickson*, the WPA applies to reports made about fellow employees as well as employers. *Id.* at 74-75. However, the *Dudewicz* Court apparently affirmed the *Dickson* Court's ruling that, because the plaintiff in *Dickson* reported the violation only to his employer and not to a public body under the WPA, the WPA did not apply. *Id.* at 77 n 4. Specifically, the *Dudewicz* Court explained:

In any event, *Dickson* is clearly distinguishable on its facts. Forgetting for a moment who broke the law, the plaintiff in *Dickson* reported the violation only to his employer, not to a public body within the meaning of the WPA. On *these* facts, the panel correctly found that the WPA was inapplicable. While its ruling was correct, the panel made an unfortunate comment in dicta stating that the purpose of the WPA was to protect only those employees who reported violations of law by their employers. It is this comment that is erroneous. [*Id.*]

In *Heckmann, supra,* another panel of this Court interpreted the above footnote in *Dudewicz* to require that, to qualify for WPA protection, the employee must report the misconduct to a "higher authority," which means a *separate public body. Heckmann, supra* at 495-496. In *Heckmann,* the plaintiff was a civilian employee of the fiscal operations section of the Detroit Police Department. *Id.* at 482. The plaintiff sent a letter that contained allegations of mismanagement and fraud within his department to a deputy chief of police, to the chief of police (Jerry Oliver), to Mayor Kwame Kilpatrick, and to the president of the plaintiff's union. *Id.* at 482-483. The plaintiff alleged that the deputy police chief told him he should start looking for another job if he did not stop "making waves." *Id.* at 483. The plaintiff also alleged that the defendants changed his job duties, passed him over for a promotion, and socially isolated him. *Id.* at 484.

The defendants in *Heckmann* argued that the plaintiff did not engage in a protected activity because he reported the misconduct through the normal chain of command, and not to a separate public body. *Id.* at 494. The *Heckmann* Court observed:

> We discern in the plain language of the WPA no exception for reporting a violation or a suspected violation of a law to a public body when the whistleblower is also an employee of a public body. We also discern no ambiguity permitting judicial construction. Nevertheless, we feel constrained by our Supreme Court's partial approval in *Dudewicz* of the analysis in *Dickson.* [*Id.* at 494-495 (citation omitted).]

On the basis of *Dickson-Dudewicz,* the *Heckmann* panel nonetheless ruled that the plaintiff satisfied this requirement because he also reported the misconduct to Mayor Kilpatrick. *Id.* at 496. The *Heckmann* Court explained:

> We hold that on the facts of this case plaintiff's report to the mayor satisfies the requirement of *Dickson-Dudewicz*. Although the mayor is the chief executive officer of the city, of which the police department is a part, the mayor's office and the police department are separate "public bodies" as that term is defined in the WPA. Thus, a report to the mayor of wrongdoing within the police department constitutes a report to a "higher authority" under *Dickson-Dudewicz* and satisfies the statutory definition of "public body." [*Id.*]

Accordingly, the panel ruled that "[t]o the extent that the WPA requires that a whistleblower report to a 'public body' other than the whistleblower's employer, we hold that plaintiff satisfied the requirement by forwarding a copy of his September 2002 letter to the mayor." *Id.* at 494.

Clearly, the *Heckmann* panel interpreted *Dickson-Dudewicz* to require that, for the WPA to apply, an employee of the Detroit Police Department may not merely report alleged misconduct to a higher rank within the department, but must find a separate "higher authority" that also constitutes a "public body" under MCL 15.361(d).[5] Defendants assert that both Deputy Chief Brown and Officer Nelthrope's claims must fail under *Heckmann*.

Officer Nelthrope argues that he satisfied *Dickson-Dudewicz* because he notified the Detroit office of the Federal Bureau of Investigation about his allegations. Both the two-page and five-page memorandums state

---

[5] We respectfully disagree that this rule falls within the plain language of the WPA. In our view, as long as the report is made to a "public body" as defined by MCL 15.361(d), it need not be to a "higher authority" or to a body different than the plaintiff's employer. This is particularly true when criminal misconduct is at issue. Is there a more appropriate "public body" to which a police officer should report a suspected crime than the police department? It is clear that the *Heckmann* panel was also troubled by this rule, but felt bound to apply it because of the *Dudewicz* footnote.

that Officer Nelthrope told internal affairs that he also forwarded his claims of misconduct to the FBI. Both memorandums, however, also state that internal affairs officers checked with the Detroit FBI office and no report was made by Officer Nelthrope. Under MCL 15.361(d)(v), the FBI would qualify as a separate "public body." However, in light of this conflicting evidence, it should be left for the jury to determine whether Officer Nelthrope actually made a report to the FBI.

With regard to Deputy Chief Brown, he presented evidence that he drafted the memorandum because Beatty requested a report from Chief Oliver regarding the EPU investigations. Pursuant to *Heckmann*, we hold that, although Deputy Chief Brown addressed the memorandum to Chief Oliver, it was drafted for the express purpose of reporting the allegations to the mayor's office. This clearly satisfies *Dickson-Dudewicz* and *Heckmann*'s interpretation of those cases and, therefore, the trial court correctly denied defendants' motion for summary disposition on this issue.

Defendants also assert that Deputy Chief Brown was not engaged in a protected activity under the WPA because, when he reported Officer Nelthrope's allegations, he was required to do so within the course of his employment. In *Terzano v Wayne Co*, 216 Mich App 522; 549 NW2d 606 (1996), this Court ruled that the WPA applies to reports of misconduct even if the report is made within the scope of the plaintiff's employment. *Id.* at 531-532. Therefore, defendants' argument is without merit because the WPA applies regardless of whether Deputy Chief Brown reported the misconduct while acting within the scope of his employment.

### D. RETALIATORY MOTIVE AND DEPUTY CHIEF BROWN'S EMPLOYMENT TERMINATION

Defendants argue that they asserted a legitimate, nonretaliatory reason for Deputy Chief Brown's removal from the PAB and that Brown failed to rebut this evidence. Defendants are correct that they presented evidence of other purported reasons for the termination of Deputy Chief Brown's employment. Specifically, Mayor Kilpatrick testified that, in addition to the anonymous information Beatty received, he terminated Deputy Chief Brown's employment because Brown lacked experience, failed to let Chief Oliver know about his investigations, and failed to follow the chain of command. However, the trial court correctly ruled that this issue should be decided by the jury because Brown presented evidence to show that Mayor Kilpatrick's reasons are unworthy of credence. *Phinney, supra* at 563.

Mayor Kilpatrick testified in his deposition that he talked to Chief Oliver before he decided to fire Deputy Chief Brown and he "discovered" that Oliver did not know about any of Brown's investigations into Officer Nelthrope's allegations. As Deputy Chief Brown points out, however, this is contrary to the statement Mayor Kilpatrick gave to the Attorney General's office when the office conducted an investigation. In his interview with a representative of that office, Mayor Kilpatrick stated that he made the decision to terminate Deputy Chief Brown's employment *before* he talked to Chief Oliver. Further, Chief Oliver testified in his deposition that he knew that Deputy Chief Brown was conducting a preliminary investigation of Officer Nelthrope's allegations, he and Deputy Chief Brown had discussed those allegations, and he asked Brown to draft the two-page memorandum at Beatty's request. Accord-

ingly, Deputy Chief Brown presented evidence to show that Mayor Kilpatrick's assertions regarding his reasons for terminating Brown's employment were false.

Further, Deputy Chief Brown presented evidence that he was performing well as a deputy chief in the PAB and that the chief of police was happy with his work. This also undermines Mayor Kilpatrick's assertion that he believed Deputy Chief Brown did not have the appropriate "skill set" to function as a deputy chief in the PAB. Moreover, to the extent Mayor Kilpatrick relied on Beatty's assertion that she received an anonymous document that suggested Deputy Chief Brown was conducting "unauthorized investigations," Chief Oliver testified that Oliver and Beatty both knew about the Manoogian Mansion party rumors and that she was especially interested in any internal affairs investigations of that issue as well as Officer Nelthrope's other allegations about the EPU officers.

Deputy Chief Brown also presented sufficient circumstantial evidence to support an inference that Mayor Kilpatrick's actual reason for firing ("unappointing") Brown was because Brown investigated and reported misconduct by Mayor Kilpatrick's family and friends on the EPU. Aside from the closeness in time between Deputy Chief Brown's submission of the two-page memorandum and the termination of his employment, both Beatty and Mayor Kilpatrick testified that the memorandum, along with the anonymous document, played a part in their decision to fire Deputy Chief Brown. Further, Mayor Kilpatrick admits that he never personally fired a deputy police chief before or after he personally fired Brown. Also, Deputy Chief Brown presented testimony that, after he was fired, Beatty ordered computer personnel to copy files and deny computer access not only to Brown, but to Donald

Parshall, Jr.; and Steven Dolunt, who also conducted investigations into Officer Nelthrope's allegations of misconduct. Further, both Parshall and Dolunt were transferred out of the PAB shortly after Deputy Chief Brown was fired.

Finally, as noted, Deputy Chief Brown showed that Mayor Kilpatrick's testimony was inconsistent with regard to whether Chief Oliver told him he did not know about Brown's investigations. This inconsistency also arguably suggests that Mayor Kilpatrick's reason for firing Deputy Chief Brown was not because of any alleged "unauthorized investigations," but because Brown was investigating allegations that might subject Mayor Kilpatrick, his family, or friends to public scrutiny or criminal charges. Indeed, Beatty's testimony regarding the anonymous document raises significant questions about her credibility and, by extension, Mayor Kilpatrick's reliance on the document (though he never saw it and does not recall Beatty giving him any specifics about it) raises suspicion regarding Mayor Kilpatrick's true motives.

In sum, the trial court had ample evidence to rule that this matter should be decided by a jury and, thus, correctly denied Mayor Kilpatrick's motion for summary disposition on Deputy Chief Brown's WPA claim.

### E. SLANDER

Mayor Kilpatrick asserts that the trial court should have granted his motion for summary disposition because he is absolutely immune from liability for plaintiffs' slander claims.

Officer Nelthrope alleges that, when Mayor Kilpatrick was interviewed by a local television station after Officer Nelthrope's name was released to the media, Kilpatrick told the reporter that Nelthrope was

not entitled to an apology, he called Nelthrope a liar, and he said he hoped Nelthrope's wife and children were watching the television broadcast. Deputy Chief Brown alleges that, in other televised interviews, Mayor Kilpatrick had stated that Brown was fired for keeping information from the chief of police and for conducting unauthorized investigations.

As this Court explained in *Colista v Thomas*, 241 Mich App 529, 538; 616 NW2d 249 (2000):

> In order to make a prima facie case of defamation, a plaintiff must show (1) that the defendant made a false and defamatory statement concerning the plaintiff, (2) that the defendant published the defamatory statement to a third party, (3) that the defendant was at least negligent in publishing the statement, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication (defamation per quod).

According to Mayor Kilpatrick, when he made the allegedly slanderous comments, he was acting within the scope of his authority as the mayor of Detroit and, therefore, cannot be liable in tort. The governmental tort liability act (GTLA), MCL 691.1407(5), provides that "[a] judge, a legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority." However, our Supreme Court has explicitly held that "the highest executive officials of local government are not immune from tort liability for acts *not* within their executive authority." *Marrocco v Randlett*, 431 Mich 700, 710-711; 433 NW2d 68 (1988) (emphasis added). Officer Nelthrope and Deputy Chief Brown argue that, when Mayor Kilpatrick made the allegedly

defamatory comments, he was acting outside the scope of his executive authority.

Mayor Kilpatrick relies primarily on *American Transmissions, Inc v Attorney General*, 454 Mich 135; 560 NW2d 50 (1997). During the 1980s, Michigan Attorney General Frank Kelley conducted an investigation of certain transmission shops to determine whether they were performing unnecessary work. *Id.* at 136. Around the same time, General Motors expressed concern that certain shops were telling customers that every GM car brought in for work required significant transmission work, although only one transmission model was found to have problems. *Id.* GM assisted in Kelley's investigation and a newspaper article later suggested that GM "may have stood to gain by the investigation." *Id.* In a television interview, Kelley responded to the allegation and referred to American Transmissions shops as "crooks" and "cheats." *Id.* at 137.

American Transmissions sued Kelley and the trial court granted summary disposition to Kelley because he is immune from liability as a highest elective official. *Id.* at 137-138. The Court of Appeals reversed and ruled that the court was required to decide if plaintiffs established a genuine issue of material fact regarding whether Kelley was acting within the scope of his authority when he made the comments. *Id.* at 138. In analyzing the issue, our Supreme Court affirmed its prior analysis in *Marrocco* in which the Court stated:

> "We hold that the highest executive officials of local government are not immune from tort liability for acts not within their executive authority. The determination whether particular acts are within their authority depends on a number of factors, including the nature of the specific acts alleged, the position held by the official alleged to have performed the acts, the charter, ordinances, or other local

law defining the official's authority, and the structure and allocation of powers in the particular level of government." [*Id.* at 141, quoting *Marrocco, supra* at 710-711.]

However, the Court in *American Transmissions* overruled the Court of Appeals in *Gracey v Wayne Co Clerk*, 213 Mich App 412; 540 NW2d 710 (1995), in which this Court ruled that officials act outside their authority under the GTLA if they intentionally use their "authority for a purpose unauthorized by law." *Id.* at 142, quoting *Gracey, supra* at 417. Thus, the Supreme Court rejected *Gracey*'s holding that a government official may be held liable in tort if he or she uses a legitimate forum, such as a press conference, to disseminate false information. *Id.* at 142-143. In other words, as the *American Transmissions* Court held, there is no "malevolent-heart exception" to the rule that Kelley, as the highest executive official, was immune from liability for comments made in response to questions about his fraud investigation. *Id.* at 143-144.[6]

Here, plaintiffs concede that Mayor Kilpatrick acted within the scope of his *employment* when he gave a press conference or answered questions from reporters. However, plaintiffs argue that Kilpatrick's conduct, regardless of his intent, placed his actions outside the scope of his *authority* because he made the comments for purely personal reasons.

---

[6] In *Meadows v Detroit*, 164 Mich App 418; 418 NW2d 100 (1987), this Court also relied on *American Transmissions* and held that Detroit may not be held liable for a letter written by its police chief that stated, in response to a citizen inquiry, that the plaintiff failed to report that his partner had accepted a bribe, which amounted to "criminal misconduct." *Id.* at 427. Because the police chief was acting "within the scope of his authority" in answering the citizen's inquiry, he was absolutely immune from liability and neither he nor Detroit could be held liable for his conduct. *Id.* at 428, 431-432.

Mayor Kilpatrick made the arguably defamatory remarks about Nelthrope and Brown while answering questions about police department investigations and Brown's dismissal. These fall within the conduct contemplated in *American Transmissions* because, regardless of whether Mayor Kilpatrick intended to lie or mislead the public about the two plaintiffs, he was acting within the scope of his authority as mayor to respond to questions about personnel and city issues. We recognize that this is a very close question because a jury could find that Mayor Kilpatrick's statements to the press may very well have been part and parcel of his alleged retaliatory conduct against Nelthrope and Brown. Further, the facts suggest that the mayor's remarks may have been motivated by and directly related to his effort to derail an investigation of himself. Nonetheless, because *American Transmissions* holds that there is no motivation or intent exception to the immunity provided by MCL 691.1407(5), we cannot conclude that Mayor Kilpatrick was acting outside the scope of his authority, and he is therefore entitled to absolute immunity under the GTLA. *Baker v Couchman*, 271 Mich App 174; 721 NW2d 521 (2006).

Affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.