# STATE OF MICHIGAN

# COURT OF APPEALS

---

INFORMATION SYSTEMS INTELLIGENCE,
LLC,

      Plaintiff-Appellant,

v

MARK EISENBARTH,

      Defendant-Appellee,

and

THE HERALD PUBLISHING COMPANY, LLC,
and THE MUSKEGON CHRONICLE
PUBLISHING COMPANY, LLC,

      Defendants.

UNPUBLISHED
January 16, 2018

No.  336213
Muskegon Circuit Court
LC No.  16-003023-CZ

Ingham Circuit Court
LC No.  16-1282-VJ

---

Before:  MURPHY, P.J., and M. J. KELLY and SWARTZLE, JJ.

PER CURIAM.

In this defamation suit, plaintiff Information Systems Intelligence, LLC appeals as of right the trial court's order, Hon. Joyce Draganchuk presiding on reassignment,[1] granting defendant Mark Eisenbarth's[2] motion for summary disposition under MCR 2.116(C)(7) on the basis that defendant was immune from tort liability as the highest-appointed official of Muskegon County.  We affirm.

---

[1] Plaintiff brought the action in Muskegon Circuit Court.  Because all of the judges of the Muskegon Circuit Court disqualified themselves from hearing the case, the case was reassigned to Judge Draganchuk and heard in the Ingham Circuit Court.

[2] Plaintiff's original complaint included as defendants The Herald Publishing Company, LLC, and The Muskegon Chronicle Publishing Company, LLC.  Plaintiff, however, voluntarily dismissed the claims against those defendants without prejudice.  Accordingly, because plaintiff's dismissal left defendant Eisenbarth as the only defendant in this case, references to "defendant" in this opinion refer only to defendant Eisenbarth.

-1-

# I. BACKGROUND

The pertinent facts underlying this dispute are straightforward. In November 2014, defendant was appointed County Administrator by the Board of Administrators of Muskegon County. Rule XIX of the Rules of the Muskegon County Board of Commissioners states that the County Administrator "shall be the chief administrative officer of the county." Additionally, the "Statement of Policy" contained in those rules declares that the County Administrator shall "direct and supervise the accounting and control functions necessary to insure compliance with the budget as adopted by the board" and shall "supervise and direct all county agencies and personnel under the jurisdiction of the Board of Commissioners."

Plaintiff is an information technology (IT) services provider which, in 2011, began providing IT services to Muskegon County on a number of projects. Under the former county administrator, in September 2013, plaintiff entered into a services agreement with Muskegon County that was set to expire in October 2018. Plaintiff also entered into a project-specific services agreement with Muskegon County in 2014. Plaintiff's relationship with Muskegon County ended, however, in April 2015 when an attorney for the County sent plaintiff a termination letter.

In May 2015, defendant authorized a press release to be issued to the MLive Muskegon Chronicle (MLive). The press release stated:

> The County of Muskegon, in 2013, had entered into an agreement with an Information Technology (IT) company called ISI to implement changes recommended by Plante Moran to address both the hardware and software technology needs of the County. The service agreement required that the County pay ISI $66,000 per month to compensate them to service the IT needs of the County.
>
> In the summer of 2014, County Administration began to question ISI's invoices that were being generated and began to ask for various performance criteria. In addition, ISI requested additional funding per month for existing services per "agreement" from the former Finance Director.
>
> The current County Administrator, Mark Eisenbarth, assumed organizational responsibilities as the County's Administrator at the beginning of November 2014. Administrator Eisenbarth and his staff began an evaluation of the IT services last winter. During that process, it was learned that, while the Board had approved IT upgrade projects in the amount of $4.2 million dollars, it had paid more than $11 million dollars for software, products and services over a 3 year period of which $9.9 million was paid to ISI. Administrator Eisenbarth also learned that they had prepaid $288,000 for technical support that they could not verify was ever accomplished. By late January, Administrator Eisenbarth authorized Corporate Counsel, Williams Hughes, PLLC, to obtain additional information, evaluate our options and recommend solutions. That process was completed by the beginning of April. The preliminary investigative work done by

Corporate Counsel and their opinion about possible solutions was shared with County Commissioners in a closed session.

Once again, after being confidentially briefed by Corporate Counsel, on April 23, 2015 the Administrator, Corporate Counsel and the County Board concluded that the provisioning of IT services was an essential activity to the County and that immediate action needed to be taken. They then unanimously selected and approved the execution of an agreement for IT services with Next IT, a local Muskegon Company.

The transition to Next IT has been smooth and efficient. The County's Administration and Board of Commissioners took swift action to change the provider of IT services and thereby realized a substantial savings, i.e. $300,000.00 per year or $900,000.00 through the balance of the agreement. The County's Administrator has directed Corporate Counsel to continue to evaluate options and to take whatever action might be appropriate to help the County recover most, if not all, of the tax dollars spent without the Board of Commissioner's [sic] knowledge or approval. That evaluation will include the commissioning by Williams Hughes, PLLC of a forensic auditor to assist in the collection of the data needed to make other important decisions associated with the potential litigation over the termination of the agreement and the unauthorized expenditures of millions of dollars.

Defendant followed up the press release with a phone interview with a reporter from MLive. In June 2015, MLive published an article exploring the claimed unauthorized expenditures to plaintiff. The article references the press release several times. Defendant was also quoted several times in the article.

In June 2016, plaintiff sued defendant for defamation. Plaintiff took offense to several statements in the article attributed to defendant. Plaintiff claimed that these statements implied that plaintiff had obtained millions of dollars in "unauthorized expenditures" from the County and claimed that those allegations caused plaintiff to suffer reputational and sales losses in excess of $10,000,000.

Defendant moved for summary disposition under MCR 2.116(C)(7) (governmental immunity) and (C)(8) (failure to state a claim). Regarding defendant's (C)(7) motion, defendant argued that he was absolutely immune from tort liability for the statements because the statements were made within the authority granted him as the highest executive official of Muskegon County. With regard to defendant's (C)(8) motion, defendant argued that plaintiff failed to state a claim for defamation because none of the statements attributed to defendant were defamatory, as the statements did not assign blame to plaintiff, but were rather blame-neutral or implied that the County did not do its job when authorizing and accounting for the expenditures.

The trial court concluded that defendant was the highest executive official of Muskegon County and that the challenged statements were made within the authority granted to him by that position. Accordingly, the trial court concluded that defendant was immune from tort liability

and granted defendant summary disposition under MCR 2.116(C)(7). The trial court did not address defendant's (C)(8) motion. This appeal followed.

## II. ANALYSIS

We review de novo a grant of summary disposition under MCR 2.116(C)(7). *Peters v Department of Corrections*, 215 Mich App 485, 486; 546 NW2d 668 (1996). Summary disposition is appropriate for governmental immunity when, considering all of the evidence before the court in the light most favorable to the plaintiff, no further factual development would justify a right of recovery against the public defendant. *Id*. at 486-487.

Under Section 7 of the Governmental Tort Liability Act, MCL 691.1407(5), the "highest appointive executive official" of any level of government is "immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her . . . executive authority." Although plaintiff makes much of the fact that defendant is an official appointed and supervised by the Board of Commissioners instead of an independent elected official, these considerations do not preclude defendant from immunity under MCL 691.1407(5). Rather, MCL 691.1407(5) expressly contemplates that an appointed official may seek immunity.

Further, there is no question of fact that defendant is the highest appointed executive official in Muskegon County. Indeed, Rule XIX of the Board of Commissioner's rules states that the County Administrator "shall be the chief administrative officer of the county." Accordingly, as the highest executive official in Muskegon County, defendant enjoys immunity from tort liability for his statements so long as those statements were made within the scope of his executive authority.

As the trial court noted, there are two cases in this jurisdiction instructive on the issue of when a public official speaks within his executive authority. In *American Transmissions, Inc, v Attorney General*, 454 Mich 135, 136; 560 NW2d 50 (1997), the Attorney General, Mr. Frank J. Kelley, conducted a " 'sting' operation" to determine whether several independent transmission shops were servicing transmissions that did not actually need repair in an effort to take "advantage of a federal consent order that required GM [General Motors] to pay for needed repairs to one of its transmission models." Five years after the sting became public, *The Detroit News* reported that GM may have been involved in the sting operation to its own gain. *Id*. In a subsequent interview with a television station, Attorney General Kelly defended the investigation and stated that he had already completed the investigation of American Transmissions by the time GM became involved and that he had "found them to be fraudulent." *Id*. at 137. Attorney General Kelly then went on to say that he "proved these people—these 13 of them—to be crooks and cheats and operating crooked transmission shops" and stated that GM "was being victimized by these crooks around the country." *Id*. American Transmissions and several of its subsidiaries sued Attorney General Kelly for defamation, and the trial court granted summary disposition in Attorney General Kelly's favor. *Id*. at 137-138.

Our Supreme Court noted that, under MCL 691.1407(5), "the highest executive officials of all levels of government are absolutely immune from all tort liability whenever they are acting within their executive authority." *Id*. at 139. Our Supreme Court continued that determining whether an executive's act is within his authority depends on several factors, including "the

nature of the specific acts alleged, the position held by the official alleged to have performed the acts, the charter, the ordinances, or other local law defining the officials authority, and the structure and allocation of powers in the particular level of government." *Id*. at 141 (internal citation and quotation notation omitted). Our Supreme Court then concluded that Attorney General Kelly was acting within the scope of his executive authority when "[d]oubts had been expressed regarding the propriety of the department's conduct, and Mr. Kelley was responding to questions regarding the investigation." *Id*. at 144.

In *Brown v Mayor of Detroit*, 271 Mich App 692; 723 NW2d 464 (2006), reversed in part on other grounds 478 Mich 589; 734 NW2d 514 (2007), this Court applied the *American Transmissions* analysis to a claim of defamation against Mayor Kwame Kilpatrick. In that case, Harold Nethrope was an officer in the Executive Protection Unit (EPU) of the Detroit Police Department. *Id*. at 694-695. Nethrope reported allegations of illegal conduct by EPU officers, Mayor Kilpatrick, and Kilpatrick's wife to the Detroit Police Department's Professional Accountability Bureau (PAB). *Id*. at 695. Gary Brown, Deputy Chief of the PAB, authorized an investigation into and prepared a memorandum regarding the allegations. *Id*. at 695-696, 698. This memorandum was given to the Chief of the Detroit Police and passed along to Mayor Kilpatrick's office. *Id*. at 698. Mayor Kilpatrick then removed Deputy Chief Brown from his position in the PAB. *Id*. at 701.

A story broke over the allegations and Deputy Chief Brown's removal, and a Detroit television reporter questioned Mayor Kilpatrick. *Id*. at 702-703. Mayor Kilpatrick denied any impropriety and called Officer Nethrope a liar. *Id*. at 703. Mayor Kilpatrick also told the press that Deputy Chief Brown was removed from his position for "breach of trust, for being unprofessional, and for conducting unauthorized investigations" and further commented that Deputy Chief Brown leaked confidential information regarding Officer Nethrope to the press, when, in fact, it was Mayor Kilpatrick's office that had done so. *Id*. Officer Nethrope and Deputy Chief Brown brought a variety of claims against Mayor Kilpatrick, including, as relevant here, slander claims. *Id*. The trial court denied Mayor Kilpatrick's motion for summary disposition on the slander claims. *Id*. at 704.

This Court reversed the trial court, concluding that Mayor Kilpatrick was immune from tort liability under MCL 691.1407(5). *Id*. at 722-723. This Court applied *American Transmissions* and determined that, because Mayor Kilpatrick was responding to an investigation into his own public office, Mayor Kilpatrick's comments were within his executive authority. *Id* at 722-723. This Court concluded that, even if Mayor Kilpatrick made the statements knowing that they were false, the statements were still not actionable because, under *American Transmissions,* "there is no motivation or intent exception to the immunity provided by MCL 691.1407(5)." *Id*. at 723.

We agree with the trial court that this case is analogous to *American Transmissions* and *Brown*. Plaintiff argues that, unlike the Attorney General or the mayor of a city, defendant's authority was narrowly circumscribed by the Board of Commissioners and, because the Board of Commissioners did not seek to place defendant in the position of press secretary, defendant's statements were outside the authority of his position. We disagree.

While it is true that defendant's authority was more closely monitored than that of the Attorney General or an elected official, the Board of Commissioners specifically granted defendant the authority to "supervise and direct all county agencies," to supervise corporate counsel, and to "direct and supervise the accounting and control functions" of the departments to be in compliance with the budget adopted by the Board of Commissioners. The statements defendant made to MLive pertain to defendant's oversight of plaintiff's contract with Muskegon County, defendant's oversight of the former finance director's alleged agreements, defendant's oversight of corporate counsel, and defendant's oversight of the budget adopted by the Board of Commissioners. That defendant, the County's highest appointed executive, had the authority to undertake the actions described in the challenged statements implies that defendant had the authority to inform the public of those actions. Undoubtedly, the agencies under defendant's control—including Public Health, Public Works, Youth Services, and Wastewater Management—had the power to issue statements regarding their respective services. That defendant could direct those agencies to issue statements, but could not himself make a statement about an operation that involved multiple agencies as well as a director of one of those agencies, is illogical and not in accordance with defendant's lawful responsibilities.

Finally, plaintiff argues that *American Transmissions* and *Brown* are distinguishable because, in those cases, the executive was responding to media questions whereas, here, defendant preemptively sent a release to a media outlet. This is a distinction without a difference. The import of *American Transmissions* and *Brown* is not that the executive was responding to media questioning, but that the executive was engaging the media in public discourse over matters concerning his public office. Under plaintiff's reading, an executive would be potentially liable for defamation when he gets "out front" of a news story and openly discusses the matter with the media; however, the executive would not be liable when he harbors information and makes a statement only when the information is otherwise uncovered. We reject plaintiff's interpretation as violating the open public discourse supported by *American Transmissions* and *Brown.*

Accordingly, we affirm the trial court's order granting defendant summary disposition under MCR 2.116(C)(7). As the prevailing party, plaintiff may tax costs under MCR 7.219.

/s/ William B. Murphy
/s/ Michael J. Kelly
/s/ Brock A. Swartzle

-6-